**MILLIKEN v. COMMISSIONER OF IN-TERNAL REVENUE.**

**COMMISSIONER OF INTERNAL REVE-NUE v. MILLIKEN.**

No. 210, Docket 22220.

United States Court of Appeals Second Circuit.

Argued March 11, 1952.

Decided April 10, 1952.

Archibald A. Patterson, New York City (Davies, Hardy, Schenck & Soons, William T. Pullman, and Seth M. Milliken, Jr., New York City, on the brief), for Seth M. Milliken, petitioner-respondent.

Morton K. Rothschild, Sp. Asst. to Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen., and Helen Goodner, Sp. Asst. to Atty. Gen., on the brief), for the Commissioner of Internal Revenue, respondent-petitioner.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Both the taxpayer, Seth M. Milliken, and the Commissioner of Internal Revenue have appealed from a decision of the Tax Court, 15 T.C. 243, finding an overpayment by the taxpayer of $28,805.83 in his income and victory taxes for the year 1943. The transactions giving rise to the two disputed issues on taxpayer's appeal are as follows: In 1922, his brother, Gerrish H. Milliken, contracted to buy the taxpayer's shares of stock in Cotwool Securities Corporation—or, as it was later called, Cotwool Manufacturing Corporation—at current book value at any time the taxpayer called upon him to do so. When taxpayer invoked the agreement in 1940, however, Cotwool's actual assets were worth far less than the stock's value on the books and Gerrish was therefore unwilling to go through with it. In substitution a new contract was effected on June 28, 1940, whereby taxpayer sold the stock to Gerrish at market value and received an option to purchase, also at market value as of that date, certain of the corporation's assets.

Among these were certain demand notes of a Whitney Manufacturing Company. Taxpayer exercised his option as to these on November 13, 1941, paying the agreed price of ten cents per thousand or a total of $3.05 for participation to the extent of $30,527.25. On December 26, 1941, taxpayer was paid interest of $4,726.65 then due; and on March 5, 1942, he was paid the full face value of his participation. In his return he reported the net amount of $30,524.20 as a short-term capital gain; and this view of the transaction was approved by the Tax Court, though on argument the Commissioner contended that it was ordinary income, and taxpayer in turn that it was a tax-free return of capital or, in the alternative, a long-term capital gain.

In early 1942 the taxpayer also decided to exercise his option as to certain other securities held by Cotwool. Cotwool, however, preferred to retain the securities and offered to pay him their current market value of $27,848.24 in exchange for his not exercising the option. Taxpayer agreed and reported the payment as a long-term capital gain. The Tax Court, however, drew it within I.R.C. § 117(g) (2), 26 U.S.C.A. § 117(g) (2), as a short-term capital transaction. The taxpayer has petitioned for review of the decision as to both these issues.

■ As to the second, we think the Tax Court clearly correct. The existence of the express provision in I.R.C. § 117(g) (2) that "gains or losses attributable to the failure to exercise privileges or options to buy or sell property shall be considered as short-term capital gains or losses" must override the rule of Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143, and C. I. R. v. Carter, 2 Cir., 170 F.2d 911, applying to property which has been received in an exchange and has no ascertainable market value. Here taxpayer admittedly did not invoke his option to secure the securities to which it entitled him, and the money he received therefor is directly "attributable" to his non-exercise of his right and thus is within the categories of the statute. Taxpayer's several arguments to the contrary, that he "asserted" his option right, that he "sold" it to the optionee,[1] and that in ultimate result he was in the same position as though he had exercised his right and then sold the property thus obtained, seem to us beside the point. They

1. Whether a mere extinguishment of an obligor's duty can ever constitute a "sale or exchange" under I. R. C. § 117(a) is left in some doubt on the authorities. Thus compare United States v. Fairbanks, 9 Cir., 95 F.2d 794, affirmed Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855, where the debtor's retirement of a bond was held not a sale or exchange, with C. L. Gransden & Co. v. C. I. R., 6 Cir., 117 F.2d 80, holding a vendee's surrender of his interest in land in return for release of personal liability for the balance of the purchase price within the statute.

appear to suggest a distinction between "non-exercise" and "failure" or perhaps between more or less careless non-action and a planned and recompensed relinquishment of the right. We see no basis in the statute for such a distinction. Possibly as asserted, the Congress may have had more directly in mind the case where, on failure to exercise an option, the consideration originally paid for it is clear gain to the optionor and loss to the optionee. But that seems to us sheer speculation. No argument now can cloud the fact that there was no transfer of property on invocation of the option and for this non-exercise or failure to operate the taxpayer received a gain. When we are given a statutory guide in a difficult field, we see no basis for making confusing exceptions to its general terms.

The other issue presented on the taxpayer's petition, namely, the correctness of the decision that the net amount he received in payment for his participation in the Whitney notes was a short-term capital gain, requires somewhat fuller development. Here we have an ingenious argument by him that this transaction constituted either wholly or partially a return of capital or was a long-term capital gain. We are not clear how far this argument was developed below, since it is not discussed at all in the opinion of the Tax Court. On this phase of the case the judge contented himself with answering only the Commissioner's argument that this was ordinary gain, as apparently not within the statutory definition, I.R.C. § 117(f), of an "exchange" for the purposes of computing capital gain or loss from a "retirement" of corporate bonds or notes. Since the Commissioner has not appealed from the ruling, that issue is not before us. Moreover, since the Commissioner has failed to reply to the taxpayer's argument, we have been forced back upon our own resources, which we can only hope will prove adequate for adjudication.

The major premise of the taxpayer's argument is the conclusion that the exercise of the option in November, 1941, was a capital transaction and therefore taxable to the amount of the value of the notes when received. If this is accepted and it is further assumed that the value of the notes when received is ascertainable, that value then constitutes a new basis to be used when they were paid off and only the excess over this basis constitutes capital gain in March, 1942. The remainder would then be a tax-free return of capital. On the other hand, if the value is unascertainable or zero he contends that the basis must then derive from the 1940 agreement creating the option. Thus under the Burnet and Carter cases cited supra he would push back the period of holding to this date and make the 1942 retirement of the notes a long-term capital gain.

■ We cannot agree. In the first place the exercise of the option could not be a capital transaction creating a new basis for the option property. For the taxpayer to argue that the Commissioner should have taxed his option exercise in 1941—a position inconsistent with his apparent failure to report it, see Orange Securities Corp. v. C. I. R., 5 Cir., 131 F.2d 662—assumes that the amount of the value of the notes which should have been taxed then as gain would be his new basis when the notes were later retired. Such a concept is distinctly at odds with the mandate of I.R.C. § 113 (a), 26 U.S.C.A. § 113(a), that "The basis of property shall be the cost of such property," not its value. The basis of the notes must be not the value of the option which was given up (or its equivalent, the value of the option property), but rather the final cost of the notes to the taxpayer. C. I. R. v. Cummings, 5 Cir., 77 F.2d 670, 673, specifically approved in Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 498, 56 S.Ct. 569, 80 L.Ed. 824. The value of notes when received is thus irrelevant and cannot be exploited in support of a contention that their payment was partially or wholly a return of capital. See also C. I. R. v. Oxford Paper Co., 2 Cir., 194 F.2d 190.

■ As to the correlative argument that this was a long-term capital gain, taxpayer has ignored the impact of Helvering v. San Joaquin Fruit & Investment Co., supra. That case, the authority of which this circuit has honored as recently as

Kinkel v. McGowan, 2 Cir., 188 F.2d 734, explicitly prescribes that the period during which option property is deemed to be held begins with the date that property was actually acquired through exercise of the option.[2] See also Mack v. C. I. R., 3 Cir., 148 F.2d 62, certiorari denied 326 U.S. 719, 66 S.Ct. 23, 90 L.Ed. 425. Thus where, as here, an option is secured more than six months prior to the sale of the property, but the date the option is exercised falls within six months of the sale, the latter only determines the period during which the gain or loss accrued.[3]

The Burnet and Carter cases cannot override this simple rule, for they have no application to the period of holding. Contrary to taxpayer's contention, they can neither push the acquisition date back nor advance the time of a sale or exchange for purposes of the long term-short term dichotomy. The principle announced in those cases extends only to the nature of payments on speculative contracts of unascertainable value received in a prior capital transaction; though it permits the taxpayer to treat such payments as return of capital or capital gain rather than ordinary income, it does not vary the period during which the property given in exchange for such contracts was held. Hence if this is less than six months, the future payments in a Carter and Burnet type obligation must be short-term capital gain, no matter how long after the exchange they are received.

Treating the amount in question as a short-term capital gain taxable to the extent that it was a gain on cost, there still might arise an interesting question as to the components of the cost figure here, to wit, whether only the amount paid on exercise or that amount plus some apportionment of the original cost of the option should be included.[4] But that interesting question is not before us. The evidence bearing upon such cost or clarifying the complicated transaction which gave rise to the option [5] was not developed of record; and, after the opinion of the court below, the parties filed an agreed computation upon which the court based its order of overpayment. Hence no issue as to such computation remains open or has been presented to us.

■ The Commissioner's petition for review presents the issue whether amounts paid in settlement of a taxpayer's liability as a transferee from a liquidated corporation are to be treated as ordinary loss deductions from income under I.R.C. § 23 (e), 26 U.S.C.A. § 23(e), or as capital losses under I.R.C. § 117(a) (3, 5). On December 8, 1941, the taxpayer owned 75 per cent of the outstanding stock of Ellingwood Company, Inc., which was dissolved on that date and subsequently liquidated. In his 1941 return he treated the amount distributed to him from the corporation as the proceeds of the exchange of his stock and claimed a long-term capital loss. In 1942 the Bureau of Internal Revenue asserted transferee liability against him and other

---

2. The present case does not fall within any of the specified categories of transactions as to which I. R. C. § 117(h) (1, 2, 3) extends the period of holding beyond the date of taxpayer's acquisition of the property.

3. Note the similar rule for determining the period for which a taxpayer has held stock or securities of a corporation, acquired through the exercise of rights, which includes "only the period beginning with the date upon which the right to acquire was exercised." I. R. C. § 117(h) (6). See E. T. Weir, 10 T.C. 996, affirmed per curiam, Weir v. C. I. R., 3 Cir., 173 F.2d 222.

4. See C. I. R. v. Cummings, 5 Cir., 77 F.2d 670, 673; Ferrall, Employee Stock Options and the Smith Case, 1 Tax L.

Rev. 225, 230–232; Greenbaum, The Basis of Property Shall Be the Cost of Such Property: How Is Cost Defined? 3 Tax L.Rev. 351, 364–367; and compare Warren v. C. I. R., 1 Cir., 193 F.2d 996, 1001–1002, and authorities there cited.

5. If the legal problems discussed in the authorities cited in note 4 supra can be solved favorably, the further difficulties before the taxpayer in attempting an evaluation of the consideration given by him for the option—involving the relinquishment of a right to require from his brother the purchase of his Cotwool stock at a price higher than the market—in addition to apportioning the value of the rights received in the option, are obvious.

*stockholders* for corporate income taxes and he then paid $33,411.29 as his pro rata share of the deficiencies. He made no deduction for this in his return for that year, and the Commissioner allowed him none in determining the deficiency involved in this case. But the taxpayer made his claim in his amended petition, and the Tax Court held it to be an ordinary deduction under the authority of Stanley Switlik, 13 T.C. 121, subsequently affirmed by the Third Circuit, C. I. R. v. Switlik, 184 F.2d 299. We regard the issue as now controlled in this circuit, however, by our contrary decision in C. I. R. v. Arrowsmith (Bauer), 2 Cir., 193 F.2d 734, reversing 15 T.C. 876, and holding such payments to be capital losses. Note, 38 A.B.A.J. 245, 1952. Our theory was in short that the payment operated to reduce the amounts received in the corporate liquidation and were more properly considered as a loss suffered in the return of capital or as a reduction of the capital gain, rather than as an ordinary hardship of business.

The fact that here the tax deficiency of the corporation was not asserted by the Bureau until after the liquidation had taken place is immaterial. The taxpayer is seeking to distinguish the Bauer case on this ground. He would import into its rationale the rule whereby foreseeability determines whether a business expense after purchase of the concern is a capital expenditure or a deductible loss to the vendee.[6] But the question in such a situation is entirely different; namely, did a deductible loss of any kind occur? Here we are concerned rather with the nature of a loss to determine whether the ordinary loss or the capital loss provision governs. That the taxpayer could not reasonably have expected the expense cannot be permitted to obscure the fact that it was related to, and therefore viewed practically was a reduction of, a previous capital gain or an increase of a previous capital loss. In the situation of transferee liability this is clearly the case, for by definition such liability stems from the liquidation distribution which, under I.R.C. § 115(c), 26 U.S.C.A. § 115(c), is a capital transaction. Neither the Switlik nor the Bauer case emphasizes the element of anticipation of the expense, and we find no sanction for it in the statute. See W. D. Haden Co. v. C. I. R., 5 Cir., 165 F.2d 588, 591.

We may add that we do not perceive how even a rule stressing foreseeability could save the taxpayer here. For errors in prior tax returns are too much a part of business life for one to say that a corporation's transferees can justifiably fail to contemplate the possibility of post-liquidation liability. Reasonable business experience would tell the average stockholder in a dissolved company that he might well be assessed for its prior tax deficiencies. That the taxpayer appears to differ with us on this point rather neatly illustrates the confusion inherent in the rule of law he urges.

Decision affirmed on the taxpayer's petition; reversed on the Commissioner's petition.

---

6. Compare Mitchell v. C. I. R., 2 Cir., 99 F.2d 778, and Holdcroft Transp. Co. v. C. I. R., 8 Cir., 153 F.2d 323. But see also C. I. R. v. Appleby's Estate, 2 Cir., 123 F.2d 700, stressing instead the purpose of the destruction of the building rather than the vendee's prescience that he would tear it down.