THE HUMACID COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FRITZ HUNTSINGER AND ESTATE OF MATHILDE HUNTSINGER, DECEASED, FRITZ HUNTSINGER, EXECUTOR, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 95343, 95344. Filed August 19, 1964.

*John H. Hall* and *Henry C. Diehl*, for the petitioners.
*J. Earl Gardner*, for the respondent.

FAY, *Judge:* The respondent, pursuant to a statutory notice dated September 18, 1961, determined deficiencies in the income tax of petitioner, the Humacid Co., for its taxable years ended December 31, 1957, 1958, and 1959, in the respective amounts of $23,975.71, $10,192.46, and $728. Pursuant to a statutory notice also dated September 18, 1961, respondent determined deficiencies in the income tax of petitioner Fritz Huntsinger and his wife Mathilde for their taxable years ended January 31, 1959 and 1960, in the respective amounts of $31,388.43 and $1,804.69. In addition to the foregoing amounts, respondent, by way of amended answer, asserted additional deficiencies in the income tax of Fritz and Mathilde Huntsinger for their taxable years ended January 31, 1959 and 1960, in the respective amounts of $38,379.51 and $10,823.88. (The Humacid Co. will hereintfter be referred to as petitioner, and Fritz Huntsinger will hereinafter be referred to as Huntsinger.)

These proceedings have been consolidated.

The principal issue for decision with regard to petitioner is whether

certain net operating losses incurred by it during 1952 and 1953 may be carried over and applied as deductions in 1957 and 1958.[1]

With regard to Huntsinger, two issues are presented for decision. First, we must decide whether Huntsinger realized ordinary income, rather than capital gain, in connection with the redemption in 1958 by petitioner of certain of its unregistered promissory notes which Huntsinger purchased from the original holders in 1953 and 1954 and then transferred to a third party several weeks prior to the redemption of the notes in 1958. In the second issue, which respondent raised by amended answer, we must decide whether Huntsinger realized ordinary income by virtue of the redemption by petitioner of certain promissory notes 3 weeks after Huntsinger had donated such notes to certain charitable and educational institutions.

All other issues raised in the pleadings have been settled pursuant to agreement between the parties or have been conceded or abandoned by respondent.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Fritz and Mathilde Huntsinger, during the years before us, were husband and wife. They filed joint income tax returns for their fiscal years ended January 31, 1959 and 1960, with the district director of internal revenue at Los Angeles, Calif.[2]

Petitioner was incorporated under California law on January 31, 1951. It filed its corporation income tax returns for the calendar years 1957, 1958, and 1959, prepared on an accrual method of accounting, with the district director of internal revenue at Los Angeles, Calif.

---

[1] An incidental issue, arising under sec. 170(b)(2), I.R.C. 1954, and concerning the year in which certain charitable contributions made by petitioner are to be allowed will be determined by the outcome of the net operating loss carryover issue. In pertinent part, sec. 170(b)(2) provides:

Any contribution made by a corporation in a taxable year to which this section applies in excess of the amount deductible in such year under the foregoing limitation shall be deductible in each of the two succeeding taxable years in order of time, * * *

Pursuant to the authority of sec. 170(b)(2), petitioner claimed deductions in 1959 for contributions of $925 and $475 made by it in 1957 and 1958, respectively. Respondent determined that these contributions could not be deducted in 1959, but were deductible only in the years incurred. Respondent's determination will be sustained in the event he prevails on the net operating loss carryover issue.

[2] Mathilde Huntsinger, originally a petitioner in the proceeding in docket No. 95344 because she filed joint income tax returns with Fritz Huntsinger during the years in issue, died on July 7, 1962. Fritz Huntsinger was duly appointed, and presently is, the executor of the estate of Mathilde Huntsinger. The estate has been substituted for Mathilde as petitioner in docket No. 95344.

*Facts Relating to Net Operating Loss Carryover Issue*

Petitioner evolved from a joint venture formed by Huntsinger and several of his friends and business associates to exploit an idea which Huntsinger had concerning the use of humic acid as a lining material in connection with the drilling of oil wells. The total cash investment by these persons in the joint venture was as follows:

| | |
|---|---:|
| Fritz Huntsinger | [1] $8,325 |
| Morris H. Barnard | 6,425 |
| William H. Bluhm | 2,500 |
| H. F. Rey | 3,000 |
| William H. Hopkins | 3,000 |
| B. B. Smith | 3,000 |

[1] All funds invested by Huntsinger in petitioner constituted community property owned jointly by Huntsinger and his wife. Therefore, all interest which Huntsinger had in petitioner, represented by stock or promissory notes, etc., constituted community property. For purposes of convenience, however, such interests shall hereinafter be referred to as belonging solely to Huntsinger.

On or about June 21, 1951, petitioner acquired the business and assets of the joint venture. In exchange therefor, petitioner issued 10,000 shares of common stock, constituting all of its outstanding stock, as follows:

| | *Shares* |
|---|---:|
| Fritz Huntsinger | 2,501 |
| Morris H. Barnard | 1,931 |
| Robert F. Hopkins | 1,116 |
| B. B. Smith | 901 |
| William H. Hopkins | 901 |
| Marianne Rey, executrix of the last will of H. F. Rey, deceased | 901 |
| William H. Bluhm | 749 |
| Raymond L. Drew | [1] 600 |
| Albert D. Barnes | 400 |

[1] The record does not indicate when Drew and Barnes joined the joint venture.

Huntsinger has been, at all times relevant hereto since petitioner's incorporation, the principal executive officer and a director of that corporation. In fact, he has been the dominant figure in its operation. From the very outset of petitioner's existence, it had been contemplated by all the shareholders that petitioner's principal source of financing would be loans from Huntsinger and Morris H. Barnard. As matters ultimately developed, Huntsinger was the principal source of petitioner's financing. From its inception until October 3, 1952, petitioner borrowed from its stockholders a total of $174,500 represented by promissory notes. Of this amount, $91,000 was advanced

by Huntsinger.  Huntsinger advanced these funds to petitioner, as follows:

| Date of promissory note | Original term | Principal amount |
|---|---|---|
| July 6, 1951 | 4 years | $15,000 |
| Aug. 13, 1951 | ---do--- | 15,000 |
| Oct. 19, 1951 | 2 years | 10,000 |
| Dec. 1, 1951 | ---do--- | 12,500 |
| Jan. 17, 1952 | ---do--- | 10,000 |
| May 2, 1952 | ---do--- | 5,000 |
| May 24, 1952 | ---do--- | 10,000 |
| July 10, 1952 | ---do--- | 10,000 |
| Sept. 18, 1952 | 4 months | 2,000 |
| Oct. 3, 1952 | 3 months | 1,500 |
| Total | | 91,000 |

Certain other of its stockholders loaned petitioner a total of $83,500 similarly evidenced by promissory notes.  These loans were made as follows:

| Lending stockholder | Date of note | Original term (years) | Amount | Totals |
|---|---|---|---|---|
| Morris H. Barnard | Apr. 15, 1951 | 4 | $30,000 | |
| | Oct. 4, 1951 | 2 | 10,000 | |
| | Nov. 14, 1951 | 2 | 12,500 | |
| | Jan. 15, 1952 | 2 | 5,000 | |
| | June 7, 1952 | 2 | 5,000 | |
| | | | | $62,500 |
| William H. Hopkins | Sept. 10, 1951 | 4 | 5,000 | |
| | Dec. 5, 1951 | 4 | 5,000 | |
| | | | | 10,000 |
| B. B. Smith | Sept. 18, 1951 | 4 | 10,000 | 10,000 |
| William H. Bluhm | Apr. 10, 1952 | 2 | 1,000 | 1,000 |
| | | | | 83,500 |

Petitioner took the first tangible steps in connection with the production of humic acid in May 1951.  At that time it entered into a 25-year lease of approximately 6 acres of land in Amador County, Calif., which petitioner intended to use as a site for an extraction plant. This lease will hereinafter be referred to as the plant-site lease.  There was an annual rental of $500 under the plant-site lease which petitioner prepaid through May 1, 1957.  On or about September 21, 1957, petitioner leased a nearby lignite mine from which it intended to extract humic acid.  The lease on the mine (hereinafter called the mine lease) was for a term of 5 years at an annual rental of $800, plus certain royalty payments.  During 1951 and 1952 petitioner constructed a plant upon the plant-site lease.  After encountering certain technical difficulties in connection with mining the lignite, petitioner in the early part of 1952 began to produce humic acid and made sales of this product to several oil companies.  However, humic acid proved an unsatisfactory material for use in shoring up the walls of oil well drill-holes. At approximately the same time, several processes for lining oil drill-

holes were developed by competitors of petitioner, and the processes proved successful. Pursuant to a decision of its board of directors in March 1952, petitioner discontinued production of humic acid.

During the period in which petitioner was extracting humic acid from mined lignite, it was discovered that the lignite contained a high grade of montan wax, which is used in shoe polish and fingernail polish. After the decision had been made to terminate the extraction of humic acid, petitioner began to produce montan wax on a commercial basis. However, because of foreign competition, this venture proved unsuccessful. In the latter part of 1952 petitioner discontinued production of this product. On December 16, 1952, petitioner's board of directors authorized Huntsinger and another director to offer petitioner's plant for sale. As of July 30, 1953, the plant had been offered for sale to four large companies located in the East. Because of a depressed market caused by lower priced, imported montan wax, Huntsinger was unable to obtain what he believed to be a reasonable price for the plant. Therefore, it was not sold.

Petitioner's board of directors, by resolution dated November 4, 1953, authorized and directed petitioner's officers "to abandon in the name of and on behalf of this corporation [petitioner] the leases, and all rights under them, which this corporation has [in the plant site and the mine]."

Petitioner executed an instrument dated November 30, 1953, whereby it "abandoned" the plant-site lease. The lessors accepted this instrument under date of December 4, 1953. By instrument dated as of November 30, 1953, petitioner, on May 26, 1954, executed an agreement whereby it abandoned the mine lease and was released from its obligations thereunder.

In its 1953 income tax return, petitioner claimed a loss in the amount of $187,380.93, with the following explanation:

Loss from abandonment of mine improvements, processing plant and other assets in connection with the attempt to manufactor [sic] humic acids and wax products. Plant was abandoned due to inability of corporation to produce at competitive prices because of foreign importations.

Petitioner's books of account, moreover, contain an entry dated December 1953 showing a "loss on abandonment," of assets in the amount of $187,380.93.

Petitioner abandoned the mine improvements, the processing plant, and the assets related thereto no later than mid-December 1953. Petitioner's records for the period January 31, 1951, to December 31, 1951, and the taxable years 1952 and 1953 show net losses from the business of mining and processing lignite products of $4,611.17, $28,944.10, and $202,272.28, respectively.

In November 1953 an individual employed by Huntsinger as an accountant consulted with a member of a national accounting firm

which in the past had done a certain amount of work for one of Huntsinger's profitable ventures, a partnership known as Pacific Tubular Service Co. (hereinafter referred to as Pacific). These two persons discussed the availability of a net operating loss carryover to petitioner in the event Huntsinger acquired control of petitioner and transferred to it the operating assets of Pacific. Pacific, which was owned in substantially equal portions by Huntsinger, his wife, and their son Carl, was engaged in the business of inspecting, testing, and servicing oilfield equipment. Pacific or its predecessor, Pacific Tubular Service Co., a corporation, reported net income from that business as follows:

| Year: | Net income |
|---|---|
| June 30, 1950 | $20,501.56 |
| June 30, 1951 | 23,982.87 |
| June 30, 1952 | 17,130.83 |
| June 30, 1953 | 18,885.60 |
| July 1, 1953–Apr. 30, 1954 | 34,189.73 |

The two accountants thoroughly analyzed the advantages and disadvantages of such a plan. Shortly thereafter, it was decided that Huntsinger would acquire control of petitioner and transfer to it certain of Pacific's operating assets.

On December 30, 1953, and January 5, 1954, Huntsinger acquired all of petitioner's outstanding stock and promissory notes not theretofore owned by him, as follows:

| Seller | Date of sale | Face value of notes | Shares of stock | Total amount paid |
|---|---|---|---|---|
| Morris H. Barnard | Jan. 5, 1954 | $62,500 | 1,931 | $1,000 |
| B. B. Smith | Dec. 30, 1953 | 10,000 | 901 | 100 |
| William H. Hopkins | do | 10,000 | 901 | 100 |
| William H. Bluhm | do | 1,000 | 749 | 100 |
| Robert F. Hopkins | do | | 1,116 | 50 |
| Marianne Rey | do | | 901 | 100 |
| Raymond L. Drew | do | | 600 | 50 |
| Albert D. Barnes | do | | 400 | 50 |
| | | 83,500 | 7,499 | 1,550 |

On May 1, 1954, Huntsinger transferred to Pacific all of his stock in petitioner. On the same date, Pacific transferred to petitioner, as a contribution to capital, the following assets:

| Assets: | Adjusted basis to Pacific |
|---|---|
| Inspection instruments | $2,437.50 |
| Tools and equipment | 5,816.72 |
| Office equipment | 24.58 |
| Automotive equipment | 11,040.45 |
| Buildings | 2,594.63 |
| Sonoscope equipment | 23,093.84 |
| Cash | 10,000.00 |
| Total | 55,007.72 |

Following these transfers, the business of inspecting, testing, and servicing of oilfield equipment, which had theretofore been conducted by Pacific, was conducted after April 30, 1954, by petitioner. Since May 1, 1954, Pacific has acted primarily as a holding company for the stock of petitioner and has not directly earned any income.

In its income tax return for the taxable year 1954, petitioner claimed a net operating loss deduction from the business of mining and processing of lignite computed as follows:

| | 1951 | 1952 | 1953 | Total |
|---|---|---|---|---|
| Net loss reported at line 32, p. 1, Form 1120, for the taxable years stated | $4,611.17 | $28,944.10 | $178,724.63 | $212,279.90 |
| Additional abandonment loss erroneously omitted from tax return | | | 23,547.65 | 23,547.65 |
| | 4,611.17 | 28,944.10 | 202,272.28 | 235,827.55 |
| [No adjustments required] Applied to current year's income | 4,611.17 | 9,040.86 | | 13,652.03 |
| Balance available for subsequent years | | 19,903.24 | 202,272.28 | 222,175.52 |

In its income tax returns for the years 1957 and 1958, petitioner claimed net operating loss deductions from losses incurred while in the business of mining and processing lignite, to be applied against income from the business of servicing and testing of oilfield equipment, computed as follows:

*1957*

Net operating loss available from 1952 _____ $19,903.24
Applied to 1955 income _____ 19,903.24      0

Net operating loss available from 1953 _____ 202,272.28
Applied to 1955 income _____ 42,176.08
Applied to 1956 income _____ 11,562.97
                                       $148,533.23
Applied to current year's income _____ _____ 57,635.01

Available for subsequent years _____ _____ 90,898.22

The remaining net operating loss deduction of $90,898.22 was applied against petitioner's taxable income of $30,684.97 for 1958, thereby eliminating taxable income for that year.

*Facts Relating to the Promissory Notes Redeemed by Petitioner in 1958*

Between July 30, 1954, and December 10, 1954, petitioner repaid Huntsinger $7,556.66 for advances on open account he had previously made to petitioner. Petitioner, however, made no payments to him during 1954 on any of its outstanding notes payable in the amount of $174,500.

On April 13, 1955, Huntsinger entered into an agreement with petitioner that in view of the insufficiency of petitioner's assets to pay the promissory notes then owed to Huntsinger in the amount of

$174,500, Huntsinger would waive interest thereon and accept payment of the principal in installments of at least $1,000 per month. Petitioner waived the statute of limitations on the notes and agreed that it would first pay the notes in the aggregate principal amount of $91,000 originally issued to Huntsinger and thereafter would pay the remaining $83,500 in principal amount of notes subsequently acquired by Huntsinger in 1953 and 1954 in such order as Huntsinger should specify.

Following the execution of said agreement of April 13, 1955, payments were made by petitioner to Huntsinger on the $91,000 principal amount of notes originally issued to him, as follows:

| Year: | Amount |
|---|---|
| 1955 | $17,500 |
| 1956 | 18,000 |
| 1957 | 18,000 |
| 1958 | 18,000 |
| 1959 | 18,000 |
| 1960 | 1,500 |
| | 91,000 |

On or about November 19, 1958, Huntsinger endorsed and delivered to a business acquaintance, one Alan Ducommun, two promissory notes in the principal amount of $30,000 and $12,500, respectively. These notes had originally been issued by petitioner to Morris H. Barnard, a former stockholder in petitioner. Huntsinger acquired these notes in January 1954 at a fraction of their face value as previously described. The notes Huntsinger transferred to Ducommun were not then in registered form nor had they been in registered form when issued during 1951. In connection with Huntsinger's endorsement and delivery of the notes to Ducommun as aforesaid, Huntsinger received $34,000, or 80 percent of the face value of the notes from Ducommun. As an integral part of this transaction, Ducommun entered into an agreement with petitioner on November 19, 1958, whereby petitioner was given the option to repurchase the notes for $36,500 at any time prior to May 2, 1959, but in any event obligated itself to purchase the notes for that amount no later than May 1, 1959. As security for this undertaking, petitioner pledged with Ducommun U.S. Government bonds having an aggregate principal amount of $40,000. On December 23, 1958, petitioner redeemed these notes by payment of $36,500 in cash to Ducommun.

The above transaction was, in effect, engineered by an accountant who did work for petitioner and Huntsinger, as well as for Ducommun. The accountant was familiar with the various tax problems of petitioner, including its tax loss carryover. The accountant had advised Huntsinger that if he sold the notes any gain realized would constitute

a capital gain, whereas if the notes were held until retired by petitioner, Huntsinger's gain would constitute ordinary income.

The petitioner exercised its option to redeem the notes for approximately 86 percent of their face value barely 34 days after their delivery to Ducommun in order to take advantage of its net operating loss carryover which was to expire on December 31, 1958. The accountant knew at the time the transaction was entered into that petitioner's loss carryover was to expire on December 31, 1958. This fact was also known to Huntsinger and petitioner at the time the transaction was entered into.

Huntsinger, in the latter part of 1958, endorsed and assigned to three charitable or educational institutions certain promissory notes in the aggregate principal amount of $41,000, originally issued by petitioner in 1951 and 1952 and later acquired by Huntsinger from the original holders, as previously described. Huntsinger never took a deduction for the worthlessness of these notes. At all times from the date that Huntsinger purchased the notes herein involved until the close of his fiscal year ended January 31, 1954, petitioner had a small amount of assets. These notes were delivered to the three institutions under cover of letters dated December 2, 1958, as follows:

FOSTER MEMORIAL HOSPITAL

1. Note dated September 10, 1951, in the principal amount of $5,000 originally issued to William H. Hopkins and endorsed to Huntsinger on December 30, 1953.
2. Note dated September 18, 1951, in the principal amount of $10,000, originally issued to B. B. Smith and Jewel Ruth Smith and endorsed in blank by them on December 30, 1953.
3. Note dated October 4, 1951, in the principal amount of $10,000, originally issued to Morris H. Barnard and Ruth Barnard, and endorsed by them to Huntsinger on January 5, 1954.

GEORGE PEPPERDINE COLLEGE

1. Note dated January 15, 1952, in the principal amount of $5,000, originally issued to Morris H. Barnard and Ruth Barnard and endorsed to Huntsinger by them on January 5, 1954.
2. Note dated June 7, 1952, in the principal amount of $5,000, originally issued to Morris H. Barnard and Ruth Barnard and endorsed to Huntsinger on January 5, 1954.

CALIFORNIA INSTITUTE OF TECHNOLOGY

1. Note dated December 5, 1951, in the principal amount of $5,000, originally issued to William H. Hopkins and endorsed over to Huntsinger on December 30, 1953.
2. Note dated April 10, 1952, in the principal amount of $1,000 originally issued to William H. Bluhm and endorsed over to Huntsinger on December 30, 1953.

At all relevant times Foster Memorial Hospital, George Pepperdine College, and California Institute of Technology (hereinafter sometimes referred to as the three exempt organizations) were tax- exempt

charitable or educational organizations, contributions to which were deductible under section 170 of the Internal Revenue Code of 1954.

When Huntsinger assigned and delivered the notes to the above organizations, he made an absolute and unconditional gift of the notes. The notes became the absolute property of the three donees, and Huntsinger retained no title or interest therein.

On December 13, 1958, petitioner wrote separately to George Pepperdine College, California Institute of Technology, and Foster Memorial Hospital offering to redeem the notes, which they had received from Huntsinger, at the following amounts, constituting 80 percent of the principal amount of each note:

| | |
|---|---:|
| Foster Memorial Hospital | $20, 000 |
| California Institute of Technology | 4, 800 |
| George Pepperdine College | 8, 000 |
| | 32, 800 |

Each of the above institutions accepted petitioner's offer, and the notes were redeemed for the above-indicated amounts on or about December 24, 1958.

Respondent, in his statutory notice of deficiency to petitioner, disallowed deductions claimed in 1957 and 1958 for a net operating loss carryover from 1953. His reason for so doing was "lack of substantiation that the deduction[s] claimed [are] allowable under the provisions of section 172 of the Internal Revenue Code of 1954." By way of further amplification, respondent noted in the statutory notice that—

The 1953 loss resulted principally from abandonment of operating assets used in the mining of lignite. In 1954 you acquired assets, in a non-taxable exchange, used for the service and testing of oil field equipment. Since 1954 you realized profits from your oil service business against which you applied the earlier losses from your mining venture.

Respondent, in his statutory notice of deficiency to Huntsinger, determined that, under the provisions of the Internal Revenue Code of 1954, Huntsinger realized ordinary income in the amount of $34,000, rather than capital gain, in connection with an alleged sale of promissory notes to a business associate.

OPINION

*Loss Carryover Issue*

It is respondent's position, essentially, that petitioner is not permitted to take deductions in 1957 and 1958 for net operating losses incurred in 1952 and 1953 because, as a result of substantial changes in equity ownership and in the nature of the business enterprise seeking to claim the deductions, petitioner is not the same taxpayer which incurred the losses within the meaning of *Libson Shops, Inc.* v.

*Koehler*, 353 U.S. 382 (1957), and section 122 of the Internal Revenue Code of 1939.[3]  At the trial, respondent asserted an alternative argument, namely, that the provisions of section 269 of the Internal Revenue Code of 1954 prohibit the allowance of the net operating loss carryover deductions claimed by petitioner.

If respondent prevails upon either ground, the net operating loss carryover deductions for the years in issue are not available to petitioner.

Petitioner raises two arguments why, for purposes of section 122 of the Internal Revenue Code of 1939, it should be considered the same taxpayer that incurred the losses during 1952 and 1953.  We are not persuaded by either of these arguments.

Petitioner recognizes that the line of reasoning adopted by the Supreme Court in *Libson Shops, Inc.* v. *Koehler, supra*, has been applied upon a number of occasions to prevent the carryover of net operating losses even though it is the loss corporation which is seeking to carry over its own premerger or preacquisition losses.  *J. G. Dudley Co.*, 36 T. C. 1122 (1961), affd. 298 F. 2d 750 (C.A. 4, 1962); *Huyler's*, 38 T.C. 773 (1962), affd. 327 F. 2d 767 (C.A. 7, 1964); *Norden-Ketay Corporation* v. *Commissioner*, 319 F. 2d 902 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; *Julius Garfinckel & Co.*, 40 T.C. 870 (1963), affd. — F. 2d — (C.A. 2, 1964; *Arthur T. Beckett*, 41 T.C. 386 (1963); *Frederick Steel Co.*, 42 T.C. 13 (1964); and *Mill Ridge Coal Co.* v. *Patterson*, 264 F. 2d 713 (C.A. 5, 1959).  Petitioner seeks to distinguish these decisions from the situation now before us upon the ground that, in each of those cases the corporation which had incurred the losses was seeking to offset them against profits earned after it had undergone substantial changes (1) in the nature of its business and (2) in its ownership and control.  Petitioner then contends preliminarily that no substantial changes occurred in the nature of its business.  The major argument presented by petitioner, however, is that even if its profits had been derived from a new line of business, petitioner may, nevertheless, off-

---

[3] Although the taxable years before us in this issue are 1957 and 1958, the applicable statutory provisions governing the availability of deductions during those years for net operating loss carryovers are found in sec. 122(a), I.R.C. 1939.  See sec. 172(e), I.R.C. 1954, which provides:

(e) LAW APPLICABLE TO COMPUTATIONS.—In determining the amount of any net operating loss carryback or carryover to any taxable year, the necessary computations involving any other taxable year shall be made under the law applicable to such other taxable year.  The preceding sentence shall apply with respect to all taxable years, whether they begin before, on, or after January 1, 1954.

See also *Herbert J. Kent*, 35 T.C. 30 (1960).  Sec. 382(a), I.R.C. 1954, which imposes special limitations on net operating loss carryovers in connection with changes in the ownership and business activities of a corporation, is not relevant hereto, because that section applies only to such changes occurring on or after June 22, 1954.  Sec. 392(b), I.R.C. 1954.  The changes in ownership and business activities that occurred in the proceeding before us took place prior to that date.

set such profits against its prior losses because there have been no substantial changes in its ownership.

Petitioner's argument that there was no change in the nature of its business is defective on two counts. First of all, our findings of fact reveal that petitioner incurred the losses sought to be carried over while engaged in the business of mining lignite and extracting therefrom (1) humic acid for use in lining oil drill-holes and (2) montan wax which is used in the manufacture of shoe and fingernail polishes. The profits against which petitioner sought to offset the losses were earned in the business of testing and servicing equipment used by certain oil companies in oilfield operations. Thus, in our opinion, the nature of petitioner's economic activities while it incurred the losses was entirely different from the nature of its economic activities which gave rise to its profits during 1957 and 1958. Secondly, petitioner's argument to the effect that there was no change in the nature of its business is misdirected because the doctrine of *Libson Shops, Inc.* has nothing whatsoever to do with changes in the nature of the business, or the economic activities, of a corporation claiming a deduction for a net operating loss. Cf. *Libson Shops, Inc.* v. *Koehler*, *supra*, and *Julius Garfinckel & Co.*, *supra*. *Libson Shops, Inc.* involved the deductibility of a net operating loss carryover claimed by a corporation which resulted from the merger into it of 16 other corporations, each of which had operated separate women's retail clothing stores. Three of these 16 corporations had incurred the losses sought to be carried over and deducted. The remaining corporations were profitable. After the merger the various constituent corporations continued to operate separate women's retail clothing stores as distinct divisions of the resulting corporation. The 3 corporations which had incurred the losses prior to the merger continued to be unprofitable thereafter, whereas the 13 remaining corporations continued to operate profitably as divisions of the resulting corporation. In effect, the taxpayer therein sought to offset the premerger losses sustained by the 3 corporations against the postmerger income of the 13 profitable divisions. The deduction for the net operating loss carryover was disallowed in that case despite the fact that no change occurred in the nature of the economic activities giving rise to the profits and losses. In *Julius Garfinckel & Co.*, *supra*, the issue before this Court was the deductibility against the postmerger income of certain premerger losses incurred by the surviving corporation. The postmerger profits were attributable to the profitable activities of the merged or disappearing corporation which continued to be operated as a separate division of the surviving corporation. Despite the fact that the profitable corporation and the loss corporation were both in the business of operating a department store

and that, therefore, the economic activities which gave rise to the losses were the same as those which gave rise to the profits, this Court disallowed a net operating loss deduction because of a lack of "continuity of business enterprise."

Obviously, "continuity of business enterprise" means something different from identity or similarity in economic endeavors. It seems to us that what the Supreme Court had in mind in *Libson Shops, Inc.* was something more in the nature of an economic concept prohibiting separate business units from combining so that profits from one separate enterprise might be offset against the losses of another.[4]

The situation now before us presents a clear-cut example of an attempt to combine two separate and distinct business units, namely, petitioner and the Huntsinger family partnership, Pacific, so that the gains generated by Pacific's business would be offset by the losses incurred by petitioner during prior years in the conduct of a separate and distinct business.

Thus, prior to Huntsinger's transfer of all of the outstanding stock in petitioner to Pacific on May 1, 1954, and Pacific's concomitant transfer to petitioner, as a contribution to capital, of all of its operating assets, petitioner and Pacific had been two separate business units. Petitioner had been organized in 1951 to engage in the mining and processing of lignite for the purpose first of producing humic acid and, subsequently, montan wax. Both of these ventures proved failures. Petitioner's plant and mine were closed down in 1952 and were abandoned before the end of 1953. From that time until Pacific transferred its operating assets to it, petitioner was no more than an inactive

---

[4] This concept is more clearly expressed in the opinion of the Court of Appeals. See *Libson Shops, Inc.* v. *Koehler*, 229 F. 2d 220, 224 (C.A. 8, 1956), where the Court of Appeals noted:

> In the case before us, we do not have "essentially a continuing enterprise." We are concerned with the merger of seventeen corporations, each of them operating an individual enterprise. Sixteen of the corporations operated sixteen individual stores in sixteen different places, four of them in Illinois and the remainder in Missouri. The seventeenth corporation provided supervisory and managerial services for the other sixteen. The appellant is here attempting to pool seventeen separate enterprises and level the ups and downs of their economic fortunes. We can see no distinction (except corporation as opposed to individual) between the situation confronting us in this case and that in which seventeen individuals, each owning and operating a separate and distinct business, trying to pool their resources and liabilities into one ownership and thereby attempting to take credit for the loss carryovers of three of the individuals whose enterprises had not returned a profit in the years prior to the combined ownership. The rule contended for by appellant would obviously give unfair advantage to corporations over individuals.

The Supreme Court, in the course of its opinion in *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957), noted:

> The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year.[5] * * * What [legislative] history there is suggests that Congress primarily was concerned with the fluctuating income of a single business. [Footnote omitted.]

corporate shell. Following this transfer, petitioner began to engage in the business which Pacific, and its corporate predecessor, had successfully conducted during the preceding years. Thereafter, Pacific ceased to engage in any active business, its only function being to hold all of the outstanding stock in petitioner. Clearly, the gains derived from the business transferred to petitioner did not arise from the same business unit which produced the losses.

Petitioner's second contention with regard to the net operating loss issue is that where a loss corporation acquires what had been a separate, profitable business, the loss corporation will be permitted to carry over its losses under the *Libson Shops* rationale if no substantial changes have occurred in its ownership and control since the time it incurred the losses. This contention has an equitable ring to it and there has been certain language in reported decisions which seems to support it in principle.[5]

It will not be necessary for us to consider this contention, for petitioner has failed to establish that substantial changes in its ownership did not occur between the time it incurred the losses and the time it sought to carry them over and claim deductions therefor. We have found as a fact that at all times relevant hereto from the organization of petitioner until December 30, 1953, Huntsinger owned 25 percent of petitioner's outstanding stock. We have further found that petitioner incurred a loss of $28,944.10 in the operation of its business during 1952 and a loss of $187,380.93 in 1953 resulting from the abandonment of its plant and mine no later than mid-December 1953.[6] Between

---

[5] Cf. the dictum of the Court of Appeals for the Second Circuit in *Norden-Ketay Corporation* v. *Commissioner*, 319 F. 2d 902, 905–906 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court, concerning continuity of business enterprise. However, it should be noted that in *Libson Shops, Inc.* v. *Koehler, supra*, and *Julius Garfinckel & Co.*, 40 T.C. 870 (1963), affd. 335 F. 2d 744 (C.A. 2, 1964), the element of common ownership of the merged corporations existed. Cf. also *Arthur T. Beckett*, 41 T.C. 386 (1963).

[6] The record does contain certain allegations made on behalf of petitioner which might (1) seem inconsistent with our finding that petitioner abandoned its mine and plant no later than mid-December 1953 and (2) suggest that these properties were, in fact, abandoned at some time during mid-1954 after Huntsinger had acquired control of petitioner. These allegations are, in general, that Huntsinger, on behalf of petitioner and at least until May 1, 1954, made several efforts to sell the plant and mine and saw to their maintenance and upkeep during such period. There is nothing in the record, however, to indicate that petitioner contends that the abandonment loss occurred at some time later than the end of 1953. In fact, petitioner seems to take the position throughout the record that it sustained a loss in the amount of $187,380.93 as a result of the abandonment of said properties during the last part of 1953. Had petitioner contended otherwise, it would have been unsuccessful. Petitioner has the burden of proof in this issue and the record is lacking in sufficient proof to base a finding that the abandonment loss was incurred subsequent to the time Huntsinger acquired control of petitioner. Moreover, even if we were to find that petitioner's actual abandonment of the mine and plant occurred subsequent to Huntsinger's acquisition of control of petitioner, the element of continuity of ownership would still be lacking. For despite the fact that the losses are recognizable, as a technical matter, only at the time of the abandonment, the losses were, in fact, sustained by a group of shareholders substantially different from those who sought to utilize petitioner's losses. *Norden-Ketay Corporation* v. *Commissioner, supra* at 906. The former shareholders of petitioner retained at most a 25-percent equity interest in petitioner at the time its losses were attempted to be carried over.

December 30, 1953, and January 5, 1954, Huntsinger acquired from petitioner's other stockholders the remaining 75 percent of the outstanding stock in petitioner, as well as promissory notes issued by it in the principal amount of $83,500.

It is contended on behalf of petitioner that during 1952 and 1953 petitioner was insolvent and the interest of its equity owners was rendered virtually valueless. It is further contended that since Huntsinger owned 25 percent of petitioner's outstanding stock and was its major creditor and principal investor during 1952 and 1953 when petitioner incurred the net operating losses sought to be carried over, Huntsinger was, for all practical purposes, the owner of a majority of the beneficial interest in petitioner. A similar argument was made in *Huyler's* v. *Commissioner*, 327 F. 2d 767 (C.A. 7, 1964), affirming 38 T.C. 773 (1962), and rejected by the Seventh Circuit Court of Appeals.

Although petitioner did not specifically rely upon the case of *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U.S. 179 (1942), in connection with its argument in support of the allowability of the operating loss deductions under section 122 of the Internal Revenue Code of 1939, petitioner nevertheless regards this case as authority for its position. The question involved in the *Limestone Co.* case was whether the element of continuity of interest was present in a certain bankruptcy reorganization so that it could qualify for nonrecognition of gain under the then applicable Code provisions. In our opinion the *Limestone Co.* case provides no support for petitioner's contention. For as we interpret that case, it requires the creditors of an insolvent corporation to take some definite, tangible step, in that case the institution of bankruptcy proceedings, before they could succeed to equity ownership of the corporation, at least for purposes of the continuity-of-interest requirement. In the situation presently before us, Huntsinger chose to purchase, for a nominal consideration, the remaining shares of stock and promissory notes of petitioner, rather than to initiate bankruptcy proceedings. Thus, in our opinion, it was only when Huntsinger purchased the stock and notes from the remaining shareholders of petitioner that he succeeded to ownership and control of petitioner for purposes of the "continuity of interest" requirement applicable to the allowance of deductions for loss carryovers under section 122 of the Internal Revenue Code of 1939. We, therefore, conclude that there was no continuity of ownership in petitioner between the time it incurred net operating losses in 1952 and 1953 and the time it sought to carry over such losses and take deductions therefor in 1957 and 1958. Thus, petitioner is not entitled to the net oper-

ating loss carryover deductions claimed by it during its taxable years in issue.

Because of the foregoing conclusion, it will not be necessary for us to consider respondent's alternative ground that the provisions of section 269 of the Internal Revenue Code of 1954 preclude petitioner from taking the deductions claimed by it.

### Petitioner's Redemption of the Promissory Notes

It is respondent's position that the sale by Huntsinger to Ducommun in 1958 of certain unregistered promissory notes, issued by petitioner in 1951 and acquired by Huntsinger from the original holders thereof in 1953 and 1954, was a sham and that, in substance, the notes were redeemed from Huntsinger, giving rise to ordinary income pursuant to section 1232(a)(1).[7] Huntsinger candidly admitted that the sale of the notes to Ducommun was to avoid the ordinary income tax consequences of a redemption of the notes. However, the fact that the transaction was motivated by Huntsinger's wish to minimize taxes does not make the sale a sham. The essential issue to be decided is whether, in substance, a sale actually took place. *Conrad N. Hilton*, 13 T.C. 623, 630 (1949).[8]

Contemporaneously with Huntsinger's transfer on November 19, 1958, of the notes to Ducommun in exchange for $34,000, petitioner entered into an agreement with Ducommun whereby petitioner was given the option to redeem the notes for $36,500, or about 86 percent of their face value, any time prior to May 2, 1959, but in any event was

---

[7] SEC. 1232. BONDS AND OTHER EVIDENCES OF INDEBTEDNESS.

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

(1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (*except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954*). [Emphasis added.]

[8] The sole authority which respondent cites in support of his position is *Army Times Sales Co.*, 35 T.C. 688 (1961). His reliance upon that decision is misdirected, for in that case this Court merely held that the predecessor of sec. 269, I.R.C. 1954, prevented an individual from receiving capital gains treatment upon the redemption from him of certain debentures by his controlled corporation. These debentures had originally been issued by that corporation prior to October 1952 in unregistered form. Petitioner acquired the notes in October 1952 for a fraction of their face amount when he acquired control of the corporation that had issued said notes. Shortly after this acquisition, the individual caused the corporation to reissue the notes in registered form as debentures. This Court held (1) that the principal purpose of acquiring the notes was so that the individual could obtain capital gains treatment when the corporation redeemed the notes with earnings derived from a profitable business which the individual transferred to the corporation, and (2) that the allowance of capital gains treatment to the individual was prohibited under the predecessor of sec. 269, I.R.C. 1954.

obligated to do so no later than May 1, 1959. As security for this undertaking, petitioner pledged Government bonds in the principal amount of $40,000 with Ducommun. By redeeming the notes for 86 percent of their face value, petitioner was aware that it would realize income through the forgiveness of indebtedness. The notes were redeemed by petitioner on December 23, 1958, 34 days after Huntsinger had delivered them to Ducommun. The accountant for Huntsinger and petitioner, who arranged the transfer of the notes to Ducommun, testified that petitioner exercised its option to redeem the notes for approximately 86 percent of their face value only 34 days after their delivery to Ducommun in order to utilize the unconsumed portion of its net operating loss carryover, which was to expire on December 31, 1958. Since this accountant prepared petitioner's income tax returns for the years 1954 and 1959 and probably prepared the returns for the intervening years, we must conclude that this fact was known by him as well as by petitioner and Huntsinger, at the time the transaction was entered into. In the absence of any convincing evidence to the contrary, we must further conclude that Huntsinger, who at that time completely controlled petitioner, took that fact into consideration in connection with his transfer of the notes to Ducommun and fully contemplated that petitioner would redeem the notes before the end of 1958 in order to utilize its net operating loss carryover. Under these circumstances, it is our conclusion that no real sale of the notes occurred; that the notes were, in fact, redeemed from Huntsinger by petitioner; and that Ducommun, whether or not he realized it, was used as a conduit through whom this redemption occurred and for which he received a consideration of $2,500. *Martin Weiner* v. *Commissioner*, 316 F. 2d 473 (C.A. 3, 1963), affirming per curiam a Memorandum Opinion of this Court; *Conrad N. Hilton*, *supra* at 630–631 (with respect to the $75,000 portion of the note).

Respondent concedes that he has the burden of proof in connection with the final issue for decision, namely, whether Huntsinger "constructively received" ordinary income in the amount of $32,800 upon the redemption of certain promissory notes donated by Huntsinger 3 weeks prior thereto to three tax-exempt educational or charitable organizations. Respondent contends that "the charitable organizations [to which the notes were donated] were conduits for the collection of ordinary income belonging to Fritz Huntsinger" and that the same arguments applicable to Huntsinger's transfer of the other notes to Ducommun are applicable to his transfer of $41,000 in principal amount of notes to the exempt organizations. Respondent has not articulated his position on this issue with any degree of clarity. However, it would seem that because the notes transferred to

the exempt organizations had been issued prior to January 1, 1955, respondent is, at least in part, relying upon the provisions of section 1232(a) of the Internal Revenue Code of 1954, in connection with his contention that the transfer and redemption of the notes resulted in Huntsinger's realization of ordinary income. Respondent, however, has failed to prove that the notes donated to the exempt organizations had not been issued with interest coupons or in registered form (cf. fn. 8 above and the discussion therein of *Army Times Sales Co.*, 35 T.C. 688 (1961)) or were not in such form when he donated the notes. Cf. *Carl Oestreicher, Trustee*, 20 T.C. 12, 14 (1953); *Lurie* v. *Commissioner*, 156 F. 2d 436 (C.A. 9, 1946), reversing 4 T.C. 1065 (1945).[9]

Despite the vagueness of respondent's argument in connection with this issue, it seems that he is relying upon two additional grounds, in addition to the provisions of section 1232(a) of the Internal Revenue Code of 1954 to support his contention. These two additional grounds are: (1) That because Huntsinger controlled petitioner and contemplated that petitioner would redeem the notes delivered to the exempt organizations before December 31, 1958, he constructively received the redemption proceeds paid by petitioner to the exempt organizations and (2) that by his donation of the notes to the exempt organizations and petitioner's subsequent redemption of the notes Huntsinger assigned income in anticipation of its receipt by him.[10] The doctrine of constructive receipt deals with the time when an amount is to be taken into income. The doctrine of anticipatory assignment involves the question of who should be taxed upon the income or gain derived.

The fact that at the time he delivered the notes to the exempt organizations on December 2, 1958, Huntsinger controlled petitioner

---

[9] Neither the notes which Huntsinger transferred to the three exempt organizations nor reproductions of the notes were introduced into evidence. Nor were any of the terms or provisions of the notes so introduced. Therefore, there is no proof before us (1) as to whether the notes could have been validly transferred or assigned other than by entry upon petitioner's books or (2) as to whether the notes themselves had "a definite number and a definite arrangement for assignment" (cf. *Edith K. Timken*, 6 T.C. 483, 487 (1946)). See *Rieger* v. *Commissioner*, 139 F. 2d 618, 621 (C.A. 6, 1943), reversing 47 B.T.A. 727 (1942). The stipulation of facts provides that the notes were endorsed to Huntsinger when he acquired them in 1953 and that Huntsinger endorsed the notes in 1958 when he donated them to the exempt organizations. However, the stipulation that the notes were so endorsed does not help respondent to meet his burden of proof; for despite the fact of endorsement it is possible (1) that the notes themselves provided that they could be transferred only by appropriate notation on petitioner's books and (2) that the notes were, in fact, transferred pursuant to such appropriate notation. Since respondent failed to prove that the notes were not in registered or coupon form, Huntsinger, therefore, would not have received ordinary income had the notes been redeemed from him. *Seth M. Milliken*, 15 T.C. 243, 247 (1950), affirmed on other grounds 196 F. 2d 135 (C.A. 2, 1952), certiorari denied 344 U.S. 884 (1952).

[10] Even if respondent were to prevail on either of these additional grounds, any income attributed to Huntsinger thereby would be taxed as gain from the sale or exchange of a capital asset; for respondent has not questioned that the notes constituted capital assets and, further, he has failed to prove the notes were not in coupon or registered form when issued or when donated to the exempt organizations.

and contemplated that petitioner would redeem the notes prior to the end of the year does not put him in constructive receipt of the redemption proceeds. Respondent has proffered no evidence that petitioner had credited or set aside any funds for the redemption of the notes prior to Huntsinger's contribution of the notes to the exempt organizations on December 2, 1958. Cf. sec. 1.451–2(a), Income Tax Regs. This Court has, upon numerous occasions, noted that the doctrine of constructive receipt is not to be lightly applied but is to be invoked only in situations where it is clearly justifiable. *Robert J. Dial*, 24 T.C. 117, 124 (1955); *Hal E. Roach*, 20 B.T.A. 919 (1930); *C. E. Gullett*, 31 B.T.A. 1067, 1069 (1935). The mere fact of Huntsinger's control of petitioner is not sufficient to constitute constructive receipt. *Hyland* v. *Commissioner*, 175 F. 2d 422, 424 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court; *Robert J. Dial*, *supra; Basil F. Basila*, 36 T.C. 111, 116–117 (1961). Since respondent has failed to prove that petitioner ever set aside any funds with which to redeem the notes donated by Huntsinger to the exempt organizations prior to such transfer, Huntsinger cannot be found to have been in constructive receipt of the redemption proceeds.

We have found as a fact that Huntsinger made valid gifts of notes in the principal amount of $41,000 on December 2, 1958, giving up all right, title, and interest therein at that time. Respondent, moreover, has failed to establish that the notes so transferred by Huntsinger included any element of ordinary income thereon. Huntsinger's donation of those notes to the three organizations is not a case of anticipatory assignment of income (cf. *Helvering* v. *Horst*, 311 U.S. 112 (1940), and *S. M. Friedman*, 41 T.C. 428 (1963), on appeal (C.A. 6, May 5, 1964)), for Huntsinger was not transferring the right to receive earned income.

The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale. *Stuart A. Rogers*, 38 T.C. 785, 788–789 (1962); *Elizabeth H. Potter*, 38 T.C. 951 (1962); *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954); *Estate of W. G. Farrier*, 15 T.C. 277 (1950); *Elsie SoRelle*, 22 T.C. 459, 475–479 (1954); *South Lake Farms, Inc.*, 36 T.C. 1027 (1961), affd. 324 F. 2d 837 (C.A. 9, 1963). On the basis of the facts before us, it is our opinion that Huntsinger did this. Therefore, he should not be regarded as having received income upon petitioner's redemption of the notes from the three charitable or educational organizations.

*Decisions will be entered under Rule 50.*