Roy N. Livingston and Bess B. Livingston v. Commissioner.
Livingston v. Commissioner
Docket No. 5731-63.
United States Tax Court
T.C. Memo 1966-49; 1966 Tax Ct. Memo LEXIS 232; 25 T.C.M. (CCH) 277; T.C.M. (RIA) 66049; March 10, 1966
Jonathan Golden and Cleburne E. Gregory, Jr., 807 Fulton Federal Bldg., Atlanta, Ga., for the petitioners. Thomas A. Brown, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1960 in the amount of $108,636.58. The issues for decision are: (1) Whether petitioner Roy N. Livingston sustained a capital loss when all of the assets, subject to *233 all of the liabilities, of a corporation of which he was the sole stockholder were transferred to him upon his surrender, for cancellation, of his stock pursuant to a formal plan of liquidation adopted by the corporation. This question arises because of disagreement between the parties as to the fair market value of the assets transferred by the corporation to this petitioner and the basis of this petitioner in the stock surrendered. (2) What is the proper basis to petitioners for depreciation of the assets received upon the liquidation of the corporation? An issue raised in the petition with respect to the proper estimated useful life of electrical fixtures, elevators and signs is conceded by petitioners on brief and on brief the parties agree that the issue with respect to the proper deduction for medical expenses is controlled by the determination of the amount of petitioners' taxable income. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Atlanta, Georgia, filed a joint Federal income tax return for the calendar year 1960 with the district director of internal revenue, Atlanta, Georgia. Roy *234 N. Livingston (hereinafter referred to as petitioner) has been in the parking lot and garage business in Atlanta, Georgia for the past 34 years. During this period he has purchased, owned, leased, sold, and operated parking lots and garages in the city of Atlanta. Prior to the time he constructed the facility involved in this case (hereinafter referred to as the Five Points Building), he had constructed four multistory parking decks. Petitioner had been interested in acquiring the site on which the Five Points Building was later constructed since around 1946 and had attempted to lease it but had been unable to do so. An old and very famous hotel known as the Kimball House had been located on this property since approximately 1870. This site is located in the center of the Atlanta commercial district which contains office buildings and bank buildings. There are some shops in the area but no large department stores very near the site. One side of the site is about 90 feet from the corner of a commercial section in Atlanta, Georgia generally referred to as Five Points. The land included in this site lies approximately 163 feet on Decatur Street, 215 feet on Pryor Street, 160 feet on *235 Wall Street plus a 15 foot frontage on Peachtree Street, widening to approximately 21 feet. The back portion of the property is approximately 300 feet from the location of another property owned by petitioner and referred to as the Bird Cage Garage which was located at 19 Exchange Place. The fee to the property was owned by the Grant family which, when petitioner first became interested in the property, consisted of John W. Grant, Jr., his two sisters, and their mother. The property was leased to a corporation, The H. I. Kimball House Company, the stock of which was owned by John W. Grant, Jr. After the death of his mother, John W. Grant, Jr., and his two sisters were willing to have a sublease made of the property but were unwilling to extend the time of the lease to the H. I. Kimball House Company which expired December 31, 1982. In 1958 petitioner negotiated with the lessee, the H. I. Kimball House Company, and with the owners of the property with a view to razing the existing building and erecting a modern parking facility. As a result of these negotiations, he was able to obtain a sublease, but unable to obtain a term longer than the existing lease. A corporation known as *236 Five Points Parking Center Company (hereinafter referred to as Five Points) was incorporated to sublease The H. I. Kimball House Company property, raze the existing building, and construct a modern parking facility. Stock therein was sold in November 1958 as follows: Stockholder
No. of Shares
Cost
Petitioner
375
$18,750.00
Ellis G. Arnall
50
2,500.00
Sol I. Golden
50
2,500.00
Cleburne E. Gregory, Jr.
25
1,250.00 The three stockholders other than petitioner were attorneys who were long-time friends of petitioner and who wanted to invest in a garage. On November 13, 1958, a lease was executed between The H. I. Kimball House Company, as lessor, and Five Points Parking Center, Co., as lessee, for the property known as 15 Peachtree Street, Atlanta, Georgia. The lease provided for an annual rental of $42,500.04 to December 31, 1972, increasing to an annual rental of $47,499.96 to December 31, 1982, the date of the termination of the lease. It also provided for an additional rental of 25 percent of the amount by which gross receipts from parking plus the lessee's rental exceeded $220,000 for any lease year. Under the terms of the lease Five Points became *237 obligated to construct on the leased premises a parking garage of not less than 140,000 square feet with parking facilities for approximately 430 automobiles, with the building, including a space for stores, office, or display purposes, containing aggregate footage of not less than 130 feet on Decatur Street and of a depth of not less than 105 feet, the building to cost not less than $550,000. Petitioner guaranteed the full and complete performance of the terms of the lease with respect to the demolition of the existing building and construction of the improvements. At the time petitioner negotiated the lease, he contemplated building on the property a building of approximately the type that the lessee was obligated to place on the premises under the terms of the lease. Petitioner had been successful with garages and at the time he negotiated the lease with respect to The H. I. Kimball House Company property he had every expectation that it would be an excellent investment. He had studied garage operating costs throughout the United States, including those of his own garages and had become familiar through personal experience with the construction costs of garages, with the market *238 value of garages, and with the value of other properties in downtown Atlanta, as well as with the lease value of parking operations in Atlanta. Petitioner had discussed with builders the cost of erecting a parking garage with some stores on the property he was contemplating leasing, and his own estimate was that in addition to the cost of the demolition of the building on the property, the building which he would erect on the property would cost approximately $550,000. Petitioner was planning a garage, which was altogether self-parking, using the same basic design that had been used by him in constructing other parking decks. To finance the construction under the terms of the lease, Five Points borrowed $350,000 from The H. I. Kimball House Company, the lessor, repayable in 20 years, and borrowed $200,000 from The Trust Company of Georgia repayable in 10 years, both loans bearing interest at 5 1/2 percent. The loan from The H. I. Kimball House Company was secured by a deed of trust to the leasehold estate. Petitioner was personally obligated on both loans and the other stockholders of Five Points were personally obligated on the loans in proportion to their stock ownership. *239 Petitioner's guarantee of the loan to The Trust Company of Georgia was secured by his stock in Bird Cage Garage, a corporation of which petitioner was the sole stockholder. That corporation owned the multistory parking facility known as the Bird Cage Garage at 19 Exchange Street in Atlanta, Georgia. The liability of Cleburne E. Gregory, Jr., was secured in part by collateral deposited with the bank. During the planning and construction of the Five Points building, there were a number of changes made. The first change in the design of the building was the reversing of part of the ramping design so that a row of second floor offices could be added by pouring a separate floor without using additional cubic footage. A change in stairwells and elevator shafts was necessitated by finding a bad foundation situation on adjoining property. During demolition of the existing building, it was found that the beam of an old two-story store next to the site was supported by a wall of the Kimball House and the contractor discontinued demolition of the party wall. The property on which this store stood, known as Five Decatur Street, was owned by The H. I. Kimball House Company. Five Points and *240 that company entered into a joint venture agreement, purchased the lease on the Five Decatur Street property, and leased the adjoining property from the owner thereof for the purpose of tearing down the old building and erecting a new store. This entailed a cost of around $32,000. Before the details with respect to the Five Decatur Street property had been worked out, the contractor had proceeded with the building of the Five Points building and because of the uncertainty with respect to the corner of the building adjacent to Five Decatur Street, had left the corner of the building unfinished. This required the contractor to build that portion of the building at a later date which increased the cost of the building. After discussion with certain real estate agents and the other stockholders and obtaining preliminary estimates, petitioner decided to add office space on the eighth and ninth floors of the Five Points building and to add an extra parking floor to the garage. There were no combination parking and office buildings similar to the type petitioner contemplated building in Atlanta, but petitioner had seen a building of this type in Houston, Texas. The office floors were *241 to be placed in the form of a "U" around the perimeter of the building. It was determined that from a construction viewpoint the project was feasible and the lease was amended on July 17, 1959, to permit the use of the building for office or other commercial purposes above the top parking level and to provide for additional rental of 5 percent of all amounts received by the lessee as compensation for the use of such space, commencing May 1, 1970. Petitioner's first estimate of the cost of the additional space, after discussion with the contractor, engineer, and architect, was around $350,000. This amount was arrived at by figuring garage space at $3 per square foot after the slab on grade and office space at $15 per square foot less certain adjustments. It was petitioner's opinion that the building could be built for within 2 or 3 percent of the estimated cost. It was necessary to secure additional financing to take care of the increased cost of the building and The Trust Company of Georgia agreed to lend Five Points an additional $300,000 at 6 percent per annum interest. Petitioner guaranteed the additional loan and the other stockholders guaranteed it in the same proportion as *242 their stock interest. The stockholders also subordinated any liabilities of the corporation to them and any dividends or distributions of assets to the indebtedness to the bank. The work on the Five Points building was done by a contractor under a verbal agreement with no maximum cost provided. Because of the occupancy above the garage, the City Building Code required two enclosed stairways coming down from the office floor to the outside at the middle of the two parking decks, which required certain structural changes in the building. This also required that a sprinkler system and certain other items be installed and made it necessary to wall in one side of the building. The subcontractors' estimates on air conditioning and heating and similar items ran substantially higher than had been originally estimated. Certain problems were encountered with the building which neither petitioner nor the contractor had contemplated when considering adding the office space. These problems included additional footings, more steel work, the use of more space for air conditioning and heating equipment on floors above the basement level, the use of more expensive concrete, the requirement for different *243 and faster type elevators, the use of more space for elevator lobbies, and a difference in the spans between the columns in the garage space and office space. The contractor was building the building almost as fast as the plans were being drawn. During the course of the construction of the building, it became apparent that the cost would be substantially in excess of the $855,000 estimated. In December 1959, the corporation had paid out $840,602 on construction of the building and its outstanding bills for construction costs were $122,000. At this time petitioner talked with the contractor and architect and asked them to draw up a completion schedule for the building. He received a schedule which he did not consider complete and on February 12, 1960, received another schedule which showed the cost to completion of the building to be in the amount of $1,457,000. Petitioner, after receiving this estimate, talked to the other stockholders and told them that he thought it would take more than the $1,457,000 to complete the building and that it would be necessary to raise the difference between the $850,000 which had already been arranged for and the final cost. The other stockholders *244 were unwilling to put in additional capital and petitioner was unwilling to carry 100 percent of the additional cost while owning only 75 percent of the stock. In February 1960, petitioner agreed to buy the stock of the other stockholders at whatever price their accountant figured it to be worth. On February 8, 1960, petitioner purchased the stock of the other stockholders as follows: Stockholder
No. of shares
Sales price
Ellis G. Arnall
50
$1,250.00
Sol I. Golden
50
1,250.00
Cleburne E. Gregory, Jr.
25
625.00
$3,125.00
Also, on February 8, 1960, petitioner offered to purchase 1,500 additional shares of the corporation's stock and the corporation amended its charter to permit the issuance of 6,000 instead of 2,000 shares of stock of a $50 par value. Petitioner agreed to purchase the 1,500 shares of $50 par value stock for $96.66 per share, which the corporation credited $75,000 to capital and $70,000 to surplus. After becoming the sole stockholder, petitioner discussed with The Trust Company of Georgia a manner of financing the additional cost of the building. He called to the attention of the bank's officers the fact that he could not withdraw *245 from the corporation since he was obligated under the lease to complete the building and pay off all of the debts. Petitioner considered it necessary to sell some of his property to raise the money required to complete the Five Points building. Sometime in late March or early April petitioner received an offer to purchase the assets of the Bird Cage Corporation. On May 2, 1960, pursuant to a plan of liquidation adopted by that corporation, all of the assets of Bird Cage Corporation were sold to the First National Bank as trustee for the Atlanta Transit Company Non-Union Pension Trust, and the corporation then distributed the proceeds received from this sale to petitioner, its sole stockholder, and liquidated. Petitioner realized a long-term capital gain in the amount of $466,309.18 upon the liquidation of the Bird Cage Corporation. Petitioner put a substantial portion of the money he received upon the liquidation of that corporation into the completion of the Five Points building. After the contract to sell the assets of the Bird Cage Corporation had been signed and petitioner was in that way assured of having sufficient funds to complete the Five Points building, he discussed *246 with his accountant the income tax effects of the large capital gain he would receive upon what he considered, in effect, to be a forced sale of his stock in the Bird Cage Corporation. He informed his accountant that he thought that because of the extra costs occasioned by the many structural changes in the building, the Five Points building would have a fair market value when completed substantially under its cost. Petitioner's accountant suggested that petitioner get some real estate experts to make an appraisal of the Five Points building and if they agreed with petitioner that its fair market value was substantially less than its cost, petitioner might consider liquidating the Five Points Corporation and using the capital loss sustained on such liquidation to reduce his capital gain on the liquidation of the Bird Cage Corporation. On April 5, 1960, the Board of Directors of Five Points adopted a resolution to dissolve and liquidate the corporation by the distribution of all of its assets as a final and liquidating dividend to the sole stockholder, the distribution to be subject to all of the debts, liabilities, contracts, and obligations of the corporation. On the same date the *247 dissolution of the corporation in accordance with the resolution of the Board of Directors was approved by the stockholder. On April 30, 1960, the corporation was liquidated and all of its assets, except for a $5,000 contingent fund, were conveyed to petitioner, its sole stockholder, who assumed all obligations and liabilities of the corporation. The corporate charter was surrendered on October 4, 1960. On April 30, 1960, when Five Points was liquidated, petitioner had received no written appraisals of the value of the corporate assets but had discussed the value of those assets with real estate agents. Subsequent to the liquidation of Five Points, petitioner, at the suggestion of his accountant, had an appraisal of the properties of Five Points made by the Atlanta Real Estate Board. A copy of the appraisal report of the Atlanta Real Estate Board was furnished to petitioner with an attached appraisal certificate dated September 30, 1960. At the date of the liquidation of Five Points, the amount of $1,185,700.32 had been expended in the construction of the Five Points building. There were at the time some unpaid obligations for work done on the building, and the cost to complete *248 the building including such unpaid obligations was estimated at $406,740. The assets received by petitioner upon liquidation were the leasehold at Five Decatur Street, the leasehold in the second and third floors of the Berrian building, and the leasehold with the uncompleted building thereon, the value of which is in issue in this case, and the following items: Asset
Value
Petty cash
$ 100.00
Accounts receivable
1,279.00
Prepaid expenses
187.00
The liabilities assumed by petitioner upon liquidation were $1,256,740, determined as follows: Creditor
Amount
The H. I. Kimball House Company
$ 350,000.00
Trust Company of Georgia
500,000.00
Cost to complete building on lease-
hold
406,740.00
$1,256,740.00
At the date of liquidation of Five Points, petitioner owned stock of the corporation, which he had purchased on the dates indicated, as follows: No. of shares of
capital stock
Date purchased
Cost
375
November 14, 1958
$18,750
125
February 8, 1960
3,125
1,500
February 8, 1960
75,000
$96,875
A payment in the amount of $30,000 made by petitioner on July 23, 1959, to the corporation and originally listed *249 as a loan was changed on the records of the corporation on February 7, 1960 to a credit to paid-in capital. In addition to the $30,000 transferred to paid-in capital on February 7, 1960, on the records of the corporation, there were also credited to paid-in capital the following amounts paid by petitioner to or for the corporation. Date
Amount
February 8, 1960
$30,000.00
February 8, 1960
10,000.00
March 22, 1960
30,000.00
April 5, 1960
50,000.00
May 14, 1960
131,498.80
October 6, 1960
1,250.41 The last two amounts listed above were for the purpose of covering overdrafts which had been honored by the bank prior to the liquidation of Five Points. The payments made by petitioner which were designated on the records of the corporation as "paid-in capital" totaled $282,749.21. On April 30, 1960, petitioner agreed to borrow $500,000 from The Trust Company of Georgia and to use the proceeds to repay to the bank the $500,000 obligation of Five Points incurred to construct the building on the leased premises. The former minority stockholders, who were limited guarantors on the obligation of the corporation to the bank, executed new limited guarantees of petitioner's *250 obligation, which guarantees were released on April 2, 1963. The fair market value on May 1, 1960, of Five Points' leasehold at Five Decatur Street, which was included in the leasehold interests distributed to petitioner was $16,500, and the fair market value of Five Points leasehold in the second and third floors of the Berrian Building was zero. The appraisal of the leasehold interest of the remaining property which is referred to as 15 Peachtree Street made by the Atlanta Real Estate Board constituted the agreed opinion of three appraisers appointed by the Board to make the appraisal requested by petitioner. Each of the individuals appointed by the Board to appraise the property had been engaged in appraisal work of commercial properties in Atlanta, Georgia for a number of years and each of such appraisers was a member of recognized professional associations of appraisers. The appraisal approach adopted by the three appraisers making the report of the Atlanta Real Estate Board was on three bases. One of these bases was their opinion as to the replacement cost of the building or average cost required to build the building which they referred to as a "physical appraisal." The *251 value placed in this appraisal report on the building by physical appraisal was $1,336,455. These appraisers also considered sales of property which they considered somewhat comparable to the Five Points building, particularly the Bird Cage Garage but did not reach a specific appraisal value on such basis. The report of the Atlanta Real Estate Board was based primarily on an approach which the appraisers referred to as an "income approach." In making their appraisal on this basis the appraisers made a determination of the amount they considered the building would produce to an investor in net rent and capitalized this amount over the period they considered would be the remaining period of the lease from the date on which they considered full rental of the building might be accomplished. The lease was not subject to renewal. The appraisal by the Atlanta Real Estate Board had been requested by petitioner sometime in July 1960, and the work was done by these appraisers in August and September 1960. At the time this appraisal was being made, the building was sufficiently completed that some of the office space and store space was already leased and the parking garage was in use. As *252 early as December 1959 some parking had been done in the parking garage for a charge but only on a very limited basis. The office space of the top level offices which were rented as of August and September when the appraisers for the Atlanta Real Estate Board were making their appraisal was being rented at a rate of $4 per square foot. The appraisers did not use this figure as an average rental figure for all of the offices but used $3.80 per square foot as the average rental rate for top level offices since in their opinion the space rented as of the time they were making their appraisal was to small users and a larger user would be able to lease space at approximately 20 percent below the rate to a small user. Therefore in their judgment $3.80 per square foot was a fair overall figure for rental of these offices. The appraisers considered that full rental of the building could not be accomplished before April 1, 1961, and therefore used a term of the lease of 21 years and 9 months at a 9 percent value for money, arriving at a factor of 9.438 by which to multiply the estimated yearly net income return from the building to arrive at fair market value for the leasehold. In determining *253 income from parking the appraisers of the Atlanta Real Estate Board determined gross receipts from the parking operations of $213,000, arrived at by assuming that one-half of the garage space or spaces for 284 cars would be occupied on a monthly basis at a $25 per month rental or a total of $85,200, and that the balance of the car spaces, the other 284, would have a turnover of two and one-half times per day with an average rental check of 60 cents for 300 days per year with a total of $127,800. These appraisers then assumed that the operation of the garage would be leased to an operator on a basis of 50 percent of the gross receipts being paid as rent and the other 50 percent being retained by the operator, so estimated a rental of $106,500 as the rental return to the investors which amount was rounded out by them to $100,000. There were a number of parking garages rented to operators in the Atlanta area, and the rental charged by the building owners ranged from 40 percent to 60 percent of the total receipts, generally with a minimum guaranteed rental. The Bird Cage Garage was operated by an operating company, the stock of which was owned 93 percent by former employees of petitioner's *254 and 7 percent by petitioner on a lease which provided for a rental of 50 percent of the gross parking receipts with a minimum monthly guarantee. It is customary in Atlanta for owners of parking garages to lease them to an operator on a lease providing for a minimum guarantee and a percentage of parking fees received. Out of all the parking facilities in Atlanta there are only a few owned by the operator. In considering the amount of net rent which an investor might expect from the parking facilities of the Five Points building, the appraisers for the Atlanta Real Estate Board considered the following information which they referred to as "Comparable Lease Information Downtown Parking Garages": Five Points Garage
Rental paid:
Building Rental: Number
Per car space
Based on same rate
Garage
of cars
per year
per car space per year
Forsyth-Hunter
328 $241
$136,406
Bird Cage Garage
512
177
100,200
15 Broad St., S.W.
200
275
155,650
79-89 Marietta St., N.W.
300
194
109,800
Forsyth Building Garage
(So high - not used)
Rich's Garage
286
250
137,500
The total income, gross dependable income, expenses, net income, and valuation *255 arrived at on an income basis by the appraisers for the Atlanta Real Estate Board were as follows: Income
32,000 sq. ft. offices at $3.80 per sq. ft.
$121,600
7,000 sq. ft. mezzanine office at $3.00 per sq. ft.
21,000
13,000 sq. ft. stores at $4.00 per sq. ft.
52,000
566 cars parking at rental value based on
50% of gross parking receipts
100,000
$294,600
Less vacancy allowance 5%
14,600
Gross dependable income
$280,000.00
Expenses
Taxes (est.)
$ 35,000
Insurance (fire and OL&T)
4,000
Management (5%)
14,000
Repairs and maintenance
5,000
Tenant alterations
2,000
Services (offices only)
39,000
Ground rent (average)
55,730
$154,730
$154,730.00
Net income (est.)
$125,270.0
Valuation of Leasehold
Valuation is figured on the present worth of net rents for twenty-one years
nine months, which allows six additional months (to April 1, 1961) to
attain full occupancy, and terminates December 30, 1982.
Present Worth of $1.00 per twenty-one years, nine months, money being
worth 9% is 9.438
$125,270.00 X 9.438 = $1,182,290.00
Valuation of Leasehold as of September 15, 1960: $1,200,000.00 The estimated taxes as used by the *256 appraisers for the Atlanta Real Estate Board were on the basis of the building having a value of $1,500,000 and the assumption that the assessed value of the building would be 50 percent of that amount, as well as the assessed value of the land which was determined by a capitalization of the rental being paid being at 50 percent of the amount of its value and a tax rate of $3.12 per $100, plus an estimate of sanitary tax of $480, resulting in $34,800 as the tax estimated, which was rounded to $35,000. The final opinion of the appraisers for the Atlanta Real Estate Board was a fair market value of the leasehold interest at 15 Peachtree Street with the building thereon in a completed state of $1,200,000 as of September 15, 1960. Petitioner also had an appraisal made by the President of a real estate firm in Atlanta, Georgia, who had been engaged in the real estate business for over 35 years at the time he made the appraisal. This appraiser had available the appraisal report of the Atlanta Real Estate Board at the time he made his appraisal. He also made a physical appraisal as well as an appraisal based on income and gave his opinion that the fair market value of the leasehold was *257 $1,000,000 as of January 18, 1961. The estimated net income of the building as used by this appraiser was $107,600 and he likewise used a 9 percent money factor on 21 years and 9 months of the lease to run, thus multiplying the net income as estimated by 9.438 and arriving at a figure of $1,015,000, which he rounded to $1,000,000. In his appraisal he used the same income figures for offices and stores as used by the Atlanta Real Estate Board, but in determining the parking income based it on 350 cars parking at a rental value based on 50 percent of the gross parking receipts to arrive at $85,000 for parking income, and he used a 10 percent vacancy allowance factor on the rentals from the parking as well as the offices and stores. Respondent had an appraisal made by an appraiser employed by the Internal Revenue Service who came to Atlanta, Georgia in late March of 1965 for the purpose of inspecting the property and making the appraisal. Respondent's appraiser had been in Atlanta several times and had, at least on one other occasion, appraised property in Atlanta, Georgia. He inspected the Five Points building on March 25, 1965 and after this inspection and consideration of other factors, *258 he made his appraisal as of May 1, 1960. Respondent's appraiser made a physical appraisal of the property when complete of $1,597,050 but for his appraisal relied primarily on an income approach, arriving at an effective gross rental income of $393,900 from which he subtracted expenses of $164,900, arriving at an estimated economic income from the property of $229,000, which he reduced by an amount he computed as the rental which would be payable to the lessor, arriving at income from the leasehold of $168,135, which he multiplied by 9.442 to arrive at an estimated value of $1,587,530 as his opinion of the fair market value of the building in a completed state as of May 1, 1960, and from this amount subtracted the estimated cost to complete of $406,470, thus arriving at a valuation of the leasehold of $1,180,790 which he rounded to $1,180,000 as the fair market value in the state of completion as it existed on May 1, 1960. In arriving at the factor of 9.442 respondent's appraiser considered, as did petitioner's appraiser, the present worth factor of $1 per annum with money being worth 9 percent, but used a period for the lease of 22 years instead of the 21 years and 9 months used by *259 petitioner's appraisers. In arriving at the total estimated gross rents of the property, respondent's appraiser used the following computation 32,000 Sq. Ft. upper floor offices at $4.00 per Sq. Ft.
$128,000
7,000 Sq. Ft. mezzanine offices at $3.00 per Sq. Ft.
21,000
13,000 Sq. Ft. stores at $4.00 per Sq. Ft.
52,000
Parking, monthly rate -
100 cars X 12 mo. at $24.50 per month
29,400
Parking, daily rate -
465 cars X average per car.50 X turnover of 2.25 equals
$523.12 per day
5 days at $523.12
$2,615.60
1 day (Saturdays) at $523.12 X 125.0%
653.90
1 day,Sunday) at $523.12 X 50%
261.56
Total weekly income
$3,531.06
52 weeks operation X 52
183,600
Total estimated gross income to property
$414,000
Respondent's appraiser assumed that the offices and stores would suffer some loss of income from vacancies through the years but that his computation under rental income from parking had already made an allowance for vacancies. He, therefore, made the following computation of effective gross rental income: Schedule of
Vacancy
Effective
Item
Gross Receipts
Allowance
Gross Income
Parking
$213,000
(See above)
$213,000
Mezzanine offices
21,000 (10%)
$ 2,100
18,900
Stores
52,000 (10%)
5,200
46,800
Sub Total
$286,000
$278,700
Upper floor offices
$128,000 (10%)
12,800
$115,200
Totals
$414,000
$393,900
*260 In arriving at the total expenses of $164,900 to be subtracted from the effective gross rental income of $393,900, respondent's appraiser considered that the following items constituted all estimated annual operating expenses of the property: Taxes
$ 35,000
Insurance
4,500
Rent Commissions (other than
parking)
12,000
Repairs and Maintenance
5,000
Tenant Alterations
2,000
Management (parking salaries
or profit)
21,000
Office Supplies
400
Materials and Supplies
7,000
Wages (office and parking)
48,000
Administrative and Miscellane-
ous
15,000
Heat, Water, Lights, and Power
15,000
$164,900
The computation of respondent's expert witness of the net rental income from the building is on the assumption that the owner of the building would run the parking facility himself and be entitled to an allowance of profit for his work in this regard of $21,000, or that he would have an operator to run the parking facility for him at a salary of $21,000. Since April 30, 1960, there have been a number of changes in the neighborhood of the Five Points building which have had a favorable effect on the use of parking facilities. Some of these changes might reasonably *261 have been anticipated as of April 30, 1960. The Bank of Georgia was considering building an office building in the vicinity of the Five Points building at the time petitioner was negotiating for the lease on the property on which the Five Points building stands. The Bank of Georgia did go ahead with its plans and built a 28-story building on which construction was started in the early part of 1961. After April 30, 1960, the Atlanta Title Building which is 7 stories was erected on property that had previously been a parking lot which is just across the street from the back of the Five Points building. The First Federal and Loan building, a 14-story building, is about a block away from the Five Points building and the First National Bank of Atlanta, at the time of the trial of this case, was in the process of building a 42-story building directly across the street from the Five Points building on property that had previously had a 220-car garage located on it, which had been out of business for some time before construction of the First National Bank Building began. From May 1, 1960, to December 31, 1960, petitioner expended on construction contracts on the Five Points building a total *262 of $240,540.27. At December 31, 1960, the building had been completed except for minor items which still needed to be finished but there were certain items that had not been accepted from subcontractors because of the work not having been done in a satisfactory manner such as leakage around certain glass installations which the glass contractor did not complete to the satisfaction of petitioner until sometime in March 1961. The contractor's fee had not been paid in full at December 31, 1960, because the building had not been finally accepted by petitioner. There therefore remained as of December 31, 1960, estimated cost to complete the building of $166,199.73. A portion of this amount was due on the items in the building which had not been paid for in full because of not having been accepted as meeting the standards agreed upon between the subcontractor and petitioner. Petitioner's operation of the Five Points building for the period from May 1, 1960, to December 31, 1960 produced the following revenues: Parking, Daily
$ 68,698.25
Parking, Monthly
14,469.18
Rents, Gross
31,417.17
Miscellaneous
143.72
Total income
$114,728.32
Petitioner's expenses in the *263 operation of this building for the period May 1 to December 31, 1960, including a deduction of $57,862.02 for depreciation and $12,315.88 for taxes as well as other expenses, resulted in a loss of $63,168.27. For the calendar year 1961 petitioner made a net profit from the operation of the Five Points building of $10,828.80. The total income from the building was $324,697.29 composed of the following: Daily parking, $156,527.79; monthly parking, $40,922.79; gross rents $126,741.47; and miscellaneous, $505.24, from which were deducted expenses totaling $313,868.49 which included taxes of $28,803.38. Petitioners on their joint income tax return for the calendar year 1960 claimed a capital loss of $329,925.10 from the liquidation of Five Points computed by considering the value of the assets received upon liquidation to be equal to the liabilities assumed so that no net distribution was received and considering their basis in the stock to be a total of $379,624.21, consisting of the cost to them of the stock plus the amounts entered on the corporate books as paid-in capital by them and subtracting from this amount $49,699.11 representing the portions of sub-chapter S losses applicable *264 to the taxpayers claimed for the years 1959 and 1960. Petitioners, in computing the depreciation claimed on their return for the year 1960 assumed that their basis in the leasehold interest was the amount of the liabilities assumed by petitioner at the date of the liquidation of Five Points to which were added certain minor amounts of office equipment and garage equipment resulting in a total value of property of $1,272,298.18, and depreciation was claimed on this basis. Respondent in his notice of deficiency disallowed the claimed capital loss of $329,925.10 with respect to the liquidation of Five Points with the explanation that petitioners had failed to establish that they were entitled to such loss, and recomputed petitioners' depreciation on the basis that the assets used by petitioner in the business known as Five Points Center totaled $1,436.023.55 rather than the $1,272,298.18 used by petitioner. Respondent's revised basis was computed by adding to the basis of $1,272,298.18 which was used by petitioner, the amount of $329,925.10 which represented the loss to petitioner disallowed by respondent and subtracting therefrom the amount of $166,199.73 which respondent designated *265 as "Unpaid Costs to Complete at 12/31/60," thus arriving at a revised basis of $1,436,023.55 which respondent prorated to the various portions of the building, its equipment, signs, etc. on the same percentages as used by petitioner. Ultimate Facts 1. The fair market value as of May 1, 1960, of the leasehold interest in 15 Peachtree Street with the building thereon on the assumption that the building was completed was $1,338,000, and since the cost to complete was $406,740, the fair market value of the leasehold interest with the building thereon in the state of completion as of May 1, 1960, was $931,260. 2. Petitioner's basis in his Five Points stock, prior to reduction for the portion of sub-section S losses applicable to him, is $379,624.21. Opinion Under the provisions of section 331(a) of the Internal Revenue Code of 1954, amounts distributed in complete liquidation of a corporation are treated as in full payment in exchange for the corporate stock. In accordance with these provisions petitioner realized a capital gain or loss upon the distribution in *266 liquidation of Five Points to the extent that the amount received in the liquidation was greater or less than his basis in the stock of Five Points. Since the distribution was in property, the amount of the distribution is the fair market value of the property received by petitioner less the amount of liabilities assumed by petitioner. It is petitioner's position that this amount is zero, and respondent's position that this amount is equal to or in excess of the amount of petitioner's basis in his stock. The parties disagree as to the amount of petitioner's basis in his stock, it being respondent's position that any payments to or on behalf of the corporation made by petitioner on or after March 22, 1960, should not be considered as a part of petitioner's basis in his stock since by March 22, 1960, a decision to liquidate the corporation had been reached. The parties are not in disagreement on the value of any assets transferred to petitioner at the dissolution of Five Points except the leasehold at 15 Peachtree Street with the Five Points building located thereon. The major disagreement as to the value of this leasehold centers around the amount of yearly net rental return that *267 an investor could expect of the building viewed as of the date of distribution, May 1, 1960, to be received over the remaining period of the lease. Both parties agree that the most feasible method of attempting to arrive at a fair market value, based on what a willing buyer would pay and a willing seller would accept for the property, neither being under compulsion to buy or sell and both having knowledge of the facts, is to determine the amount of yearly net income that might be reasonably expected from the property and to capitalize this income over the life of the lease. Although respondent uses a 22-year life and petitioner a 21-year 9-month life on the theory that the premises would not be fully rented until April 1, 1960, this does not have a great effect as to the overall value of the property as determined by petitioner's appraisers and respondent's appraiser. The real point of departure between the parties is that respondent assumes that the owner of the building would either operate the parking facilities himself or have them operated for him by a manager or employee, whereas petitioner assumes that the operation of the parking facilities would be under lease to an operator *268 and the income to the purchaser or investor in the building would be the rental received from the leasing of the parking facilities. Since customarily investors in garage property in Atlanta do lease the property to operators and since a willing buyer of the garage property would not be limited to a person qualified to operate a garage and parking service either personally or through a manager, we agree with petitioner's approach to the problem and also agree in general with the method of appraisal of the property used by the appraisers for the Atlanta Real Estate Board. We agree with respondent that the various items in the appraisal by petitioner's other expert witness are not as well supported as those in the appraisal by the Atlanta Real Estate Board. Respondent, however, points to a number of weaknesses in the appraisal as made by the Atlanta Real Estate Board, and it is because of our agreement with respondent with respect to some of these items that we have concluded that the appraisal by the Atlanta Real Estate Board is understated by $138,000 and have therefore fixed the fair market value of the leasehold on the basis of the building being completed, which is the basis *269 used by the Atlanta Real Estate Board, at $1,338,000 instead of the $1,200,000 as determined by the appraisers for the Atlanta Real Estate Board. Respondent raised some question as to whether management fees should have been allowed on the portion of the leasehold rentals applicable to the parking area, but did not pursue this issue on brief. On brief respondent makes the following four specific objections to the appraisal by the Atlanta Real Estate Board: 1. Respondent states that the appraisal by the Atlanta Real Estate Board should have used $4 per square foot for the 32,000 square feet of offices on the top floor which was the average price at which offices were rented as of August 1960, instead of using $3.80 per square foot as was done in the appraisal. 2. The respondent contends that the appraisers for the Atlanta Real Estate Board showed no justification for rounding the $106,500, computed to be 50 percent of the rentals based on estimated parking receipts, to $100,000. 3. Respondent contends that no justification has been shown by the appraisers for the Atlanta Real Estate Board for reducing the gross rental receipts from parking by 5 percent for a vacancy allowance. *270 4. Respondent contends that the deduction taken for real estate taxes in the computation made by the Atlanta Real Estate Board is overstated by at least $5,000 since it is based on a building valuation of $1,500,000 whereas the valuation by the Atlanta Real Estate Board is less than that amount. Respondent also contends that 50 percent of the receipts from parking is less than the amount that an operator would pay for a lease of the parking facilities. No valuation can be done with absolute precision. However, when the basis of a valuation is the capitalization of income, the various items going into the income estimate by the appraiser are properly subject to question. In our view the appraisers for the Atlanta Real Estate Board did show that it was reasonable to assume that when some of the office space was rented to larger users, the overall average received per square foot would be somewhat lower than it would be when rented to smaller users. We conclude that the amount of $3.80 per square foot used in the Atlanta Real Estate Board appraisal was in a reasonable range of the fair rental *271 value of the office space when such space was completely rented. However, the testimony of petitioner's expert witnesses and the other facts of record support respondent's objections to the rounding off of the estimated amount of parking revenue, the vacancy allowance on parking revenue, and the amount of the computed deduction for real estate taxes. Petitioner's witnesses estimated on a computed basis total parking receipts of $213,000 but justified the rounding of 50 percent of this amount from $106,500 to $100,000 on the contention that they also used comparable data from other garages. We have set forth the data which was contained in the notes on the appraisal report made by the appraisers for the Atlanta Real Estate Board and the only parking operation which supports rounding the figure off to $100,000 is that of the Bird Cage Garage. All of the other comparative receipts would result in an amount in excess of $106,500. While these witnesses did say they considered the Bird Cage Garage more comparable to the Five Points operation than the other garages, none of them expressed an opinion that the Bird Cage Garage was in as good a location as the Five Points building or that *272 the Five Points building was not in as good a location to obtain parking revenue as some of the other garages which had revenues per car that would result in an income of well over $106,500 net for the Five Points building parking lease. All of the witnesses stressed the fact that location has a great effect in determining the gross receipts of a parking garage. The total parking receipts received by petitioner from the garage for the year 1961 were over $197,000 and according to petitioner's appraisal witnesses, it would not be until after the first 3 months of the year 1961 that it would be expected that the full operating rentals would begin to be received. It would appear therefore that on the basis of actual experience with the garage operation petitioner's estimate of $213,000 from parking receipts was not excessive. We recognize that in making an appraisal the future actual results are unknown to the appraisers. Nevertheless, actual results, where available, may be considered as tending to confirm or disprove the expert opinion as to value, absent some change which might not have been expected when the valuation was being made. There is no precise evidence in the record as *273 to the results in years after 1961 but the testimony of petitioner indicates that parking receipts experience has been better than the estimated amount. Petitioner in his testimony pointed out the number of buildings that had been built since the Five Points building was started or completed intimating that this construction could not have been expected at the time the Five Points building was built. The very fact that petitioner who was an experienced and successful operator of parking garages had been attempting to secure the leasehold at 15 Peachtree Street to build a parking garage on the property occupied by the Kimball House Hotel indicates that he did have expectations for a growth in the area even though he might not have known precisely the firms which would build buildings there. Petitioner indicated that he knew the Bank of Atlanta was considering placing a building in the Five Points area at the time the construction of the Five Points building was started, but insofar as he knew no final decision had been reached with respect to the placing of the Bank of Atlanta building in the area. Petitioner stated that the building of the parking garage may have influenced the final *274 decision to construct the Bank of Atlanta building in that area. It would appear that an adequate parking garage in the location in the Five Points district might reasonably be expected to have had a favorable influence on the building of large office buildings in the area and that in estimating the return to be capitalized over the life of the lease the expectation of some increased office space being placed in the area should be considered. While we accept the opinion of the appraisers of the Atlanta Real Estate Board in their estimate of $213,000 as the gross rentals on a yearly basis reasonably to be anticipated at the time they were making their valuation and as of May 1, 1960, the date as of which the valuation is to be made, and also accept their opinion that a fair rental arrangement would be 50 percent of the gross receipts being paid as rent, in our view no justification was given by any one of the appraisers for the rounding of the figure of $106,500 to $100,000. We therefore think that respondent is correct that the income as determined by the appraisers of the Atlanta Real Estate Board should be increased by the amount of $6,500. Likewise, we see no justification in *275 the testimony of the appraisers who made the report for the Atlanta Real Estate Board for a vacancy allowance on the parking garage rental. It is obvious, and none of these witnesses made any statement to the contrary, that the method used to determine the gross receipts from parking allows for vacancies in the parking spaces. The allowance on 50 percent of the spaces is on a monthly rental basis and on the other 50 percent on the basis of a turnover of two and one-half times a day with an average check of 60 cents or an average receipt per space per day of $1.50 on a basis of 300 days a year. Inherent in the computation is an assumption of no receipts from daily parking for 65 days a year. From the testimony of the witnesses, the determination of the amount of the average check was on the basis that each car parked would stay on an average a little less than 2 hours. This obviously allowed on a two and one-half times turnover basis for approximately a 5-hour per day use for 300 days computed for the parking spaces other than those on a monthly rental. One of the witnesses for the Atlanta Real Estate Board attempted to justify the vacancy allowance by saying that even on the operator *276 rental basis of the parking facility it was possible that at some time there would be a vacancy but he did not know whether 5 percent was a proper amount. No one of the witnesses specifically stated that the type of lease that would be entered into with an operator, the rental to be on the basis of 50 percent of parking receipts, would not normally carry an ample period of notice of any intention not to renew, to allow under any normal circumstances the continued maintenance of the parking operation without any vacancy. Certainly no investor would permit a situation to occur whereby the parking spaces were not used for any period of time because of having no lease with an operator and certainly as long as the parking spaces were being used the investor would receive a rental return either from collecting the receipts from parking in some manner or receiving rental from an operator. No witness testified precisely that such would not be the expected situation so as to justify the 5 percent vacancy allowance with respect to the parking facilities. Although respondent did not continue to pursue in his brief the question of a 5 percent management fee charged on the parking facilities *277 rental there was no showing made in the record that his was an ordinary practice and the only actual lease of parking facilities placed in evidence, that of the Bird Cage Garage, did not carry any provision for such a 5 percent management commission. Since it might become necessary if it appeared that the parking operation lease might otherwise terminate, to pay some management commission to get a new lease, we do not consider that the income as determined by the appraisers for the Atlanta Real Estate Board should be increased by the amount of the management commission that they deducted with respect to the receipts from the parking facilities operation. We are, however, of the opinion that it is not at all certain that such an expense would be necessary and that it would be very unlikely to have a vacancy in the rental of the parking operation if a management company were receiving a commission to keep it rented. There is no problem in parking facilities of a vacancy period between tenants for redecoration or alteration. We therefore agree with respondent that the net rental income was understated by at least $5,000 because of the taking of a vacancy allowance of approximately $5,000 *278 on the parking rentals in addition to a management fee deduction on these rentals. We also agree with respondent that the estimated deduction for real estate taxes is overstated by at least $5,000. Petitioner's expert witness attempted to justify the amount of this deduction by the testimony that the tax assessor sometimes applies a "slide rule" to the physical dimensions of the property in order to arrive at a valuation and that taxes have a habit of climbing each year. The explanation of the application of a "slide rule to the physical dimentions" hardly supports petitioner's position since the estimate of his appraisers of the value of the property on a physical approach was $1,336,455, which would indicate that on a "slide rule basis" if they were correct in this appraisal, the tax assessor's appraisal would not exceed this amount. It may be that over the 22-year period taxes will increase or decrease, depending upon the varying economic conditions but this would be true with respect to the rental charges, the charges for the use of the parking spaces, and any other aspects of the appraisal. Since the other aspects of the appraisal are on the basis of rentals or charges prevalent *279 or reasonably to be anticipated as of the time the appraisal was being made, no justification has been shown for determining taxes on any other basis. Actually, the total deduction taken by petitioner's Five Points operation for taxes for the calendar year 1961 was $28,803.36. It is therefore obvious that real estate taxes for the first year after the building was substantially completed did not exceed this amount. We agree with respondent that the deduction for taxes was overstated in the amount of $5,000 in computing the net rental income in the appraisal made by the appraisers for the Atlanta Real Estate Board. Increasing the net income as computed by petitioner by the $16,500 of adjustments, which we agree with respondent should be made, results in a computed net income, on the basis of the Atlanta Real Estate Board's appraisal of $141,700, which using the factor of 9.438 converts to a fair market value of $1,338,017 which we have rounded to $1,338,000. We recognize that the other items in the appraisal of the Atlanta Real Estate Board are primarily estimates and also recognize that the amount of income might affect the average rental for the ground for which petitioner's appraisers *280 made a deduction of $55,730. However, considering all of these factors and the imprecision that necessarily is inherent in any opinion as to fair market value, we have concluded that the method used by the appraisers for the Atlanta Real Estate Board with the adjustments we have made, reasonably represents the fair market value of the leasehold with the building completed. The amount of $1,338,000 compares favorably with the amount of $1,336,455 of the physical appraisal for the building as shown by the Atlanta Real Estate Board. While ordinarily, replacement value is not a reliable indicator of fair market value, it is worthy of some consideration for a new building. If the area were as valuable a place for a parking garage facility as petitioner, an experienced operator of such facilities, considered it to be as evidenced by his consistent efforts to acquire the location on a lease expiring in approximately 23 years from the date he was negotiating for the lease, the indication is that the fair market value of the building when completed should be at least the average cost to build it. We also cannot overlook the fact that the actual cost of the building when it was completed was *281 approximately $1,600,000. We have accepted the testimony of petitioner and the contractor that this cost was higher than the cost of the building would have been if it could have been built without encountering unusual difficulties. Nevertheless, both petitioner and the contractor testified that the actual work done on the building was done as economically as feasible. They testified that the subcontracts were let at the most reasonable prices for getting quality work, that the materials were purchased at the most reasonable prices for the materials desired, and the workers performed the work for which they were paid. The next issue between the parties is the basis of petitioner's stock. Respondent contends that the basis should not include any amount credited on and after March 22, 1960, since by that time, respondent says, the decision to liquidate the corporation had been made. It is apparent from all the facts that the $30,000 payment on March 22, 1960, was the final payment on the $70,000 which was credited to surplus upon petitioner's purchase of the additional 1,500 shares of stock on February 8, 1960. There is therefore no real problem with respect to this item and it clearly *282 is a part of the paid-in capital and a part of petitioner's basis in his stock. There is no explanation of why petitioner chose to make a contribution to capital of a corporation on April 5, 1960, the date of the adoption of the resolution to liquidate. However, it is a fair inference from the very fact that as of April 30, 1960, even after this payment of funds into the corporation by petitioner there existed a bank overdraft of the corporation of over $132,000, that it was because of the need of the corporation for this money with no source of raising it except by either a loan or a contribution by petitioner. Petitioner was justified in making this item as a contribution to the capital of the corporation, since at this date it was apparent that the corporation would be unable to repay him a loan. Since petitioner assumed all liabilities of the corporation which included the overdraft at the bank, petitioner had in effect agreed to supply the amount of the $132,000 overdraft of the corporation to the bank prior to the actual date of the liquidation of the corporation. Petitioner argues that if the amount of these overdrafts had not been treated as a contribution to capital, it *283 would have constituted a capital loss in that liabilities assumed would have exceeded the assets transferred by that amount or some part of it, and therefore it would have constituted a capital loss to petitioner under Arrowsmith v. Commissioner, 344 U.S. 6 (1952), and cases following the Arrowsmith case. Respondent argues that this was not an unknown liability at the date of liquidation and therefore the Arrowsmith case is not applicable. Respondent misinterprets the Arrowsmith case. It is not because the liability was not known at the date of the distribution that the Court held the payment to be a capital loss but because in a prior year there had been a gain on the liquidation of the corporation which had been reported as a capital gain. Under the circumstances here present, where petitioner's guarantee of the performance of the corporate obligations forced him to discharge all the corporate liabilities, there would result a loss of some type on the liquidation to the extent of the excess of liabilities over assets received plus the amount of petitioner's investment in *284 the corporate stock. In Milliken v. Commissioner, 196 F. 2d 135 (C.A. 2, 1952), the Circuit Court, relying on its opinion in Commissioner v. Arrowsmith, 193 F. 2d 734 (C.A. 2, 1952), affirmed by the Supreme Court Arrowsmith v. Commissioner, 344 U.S. 6 (1952), held that a taxpayer sustained a capital loss in 1942 upon payment by a transferee of liability of a corporation, since he had claimed a long-term capital loss on his return in 1941 by treating a receipt of a distribution upon liquidation of the corporation to be in exchange for his stock. In so holding the Court stated: * * * That the taxpayer could not reasonably have expected the expense cannot be permitted to obscure the fact that it was related to, and therefore viewed practically was a reduction of, a previous capital gain or an increase of a previous capital loss. In the situation of transferee liability this is clearly the case, for by definition such liability stems from the liquidation distribution which, under I.R.C. § 115(c), 26 U.S.C.A. § 115(c), is a capital transaction. Neither the Switlik nor the Bauer case emphasizes *285 the element of anticipation of the expense, and we find no sanction for it in the statute. See W. D. Haden Co. v. C.I.R., 5 Cir., 165 F. 2d 588, 591. In the instant case petitioner had guaranteed performance of all the obligations of the corporation. He either had to supply the funds for the corporation to pay these obligations or pay them as the guarantor. In these circumstances we agree with petitioner that he did make contributions to the corporate capital by supplying such funds even though the contribution, by way of assumption of bank overdrafts, may have been after the corporation had passed a resolution to liquidate, and the actual payment of the overdrafts was not made until after the distribution in liquidation. We likewise agree with petitioner that, if the amounts of the overdraft payments of $131,498.80 and $1,250.41 are not considered as contributions to capital, the situation would be comparable to Milliken v. Commissioner, supra, and the payments of liabilities after the distribution in liquidation, which treated as in exchange for petitioner's stock resulted in a capital loss, would increase the amount of that capital loss. The situation *286 in the instant case is distinguishable from that in Ruth M. Cullen, 14 T.C. 368 (1950), and in Phil Kalech, 23 T.C. 672 (1955), relied on by respondent. In Ruth M. Cullen, supra, we held that the taxpayer had purchased the corporate stock and liquidated the corporation for the purpose of obtaining the corporate assets and therefore in substance the transaction constituted a purchase of those assets. The payments of the overdrafts in the instant case were not for a similar purpose but because petitioner was obligated to make the payment. In Phil Kalech, supra, the payment made to the corporation shortly before its dissolution was in order to receive the assets intact including a formula which did not show as an asset on the corporate books. There was no obligation on the stockholder to make the payment. The facts show that most of the $166,199.73 of the unpaid costs of the building at December 31, 1960, represented items physically in the building as of that date. We agree with petitioner that under the provisions of section 334(a) the *287 basis for depreciation of the building is the fair market value at the date of distribution plus the cost to complete which under our findings for the building on the leasehold at 15 Peachtree Street was $1,338,000. Since the fair market value of the building in its state of completion at May 1, 1960, was only $931,260, petitioner is not entitled to depreciation on the full building from the date of the distribution to him of the corporate assets. Parts of the building were in use at the date petitioner acquired the building from the corporation but other parts of the building were not completed and not in use. Cars were being parked in the building for a rental charge before the end of 1959. Respondent has recognized that petitioner is entitled to some depreciation on the building in 1960 and therefore his citation of cases holding that depreciation is not allowable on a building under construction and not in use in a business operation is inapplicable to the facts here present. Depreciation is allowable on the portions of the building not in use as of May 1, 1960, from the date such portions became completed for use in petitioner's business. The record shows that by August 1960, *288 some offices were being rented. Exactly when the building was all in a state to be used for the purposes of its intended uses is not shown in the record except that this state of completion had occurred by December 31, 1960, even though at that date there was some work still to be done on the building and some work which had been completed but not paid for because it did not meet the required standards. The briefs of both parties indicate that when the issue of the fair market value of the building and whether it was substantially completed by December 31, 1960, has been determined, the issue of the basis for depreciation can be agreed to between them under Rule 50. We have determined the fair market value of the building completed and in the state of completion as it existed on May 1, 1960, and that the building was substantially completed at December 31, 1960. Petitioner does not contest the adjustments to useful life of certain fixtures made by respondent. Therefore, the amount of the depreciation deduction to which petitioner is entitled, as well as the medical expense deduction, if any, may be computed under Rule 50. Decision will be entered under Rule 50.